459 F.2d 32
 4 Fair Empl.Prac.Cas. 353,
4 Fair Empl.Prac.Cas. 543,
4 Empl. Prac. Dec. P 7679,
4 Empl. Prac. Dec. P 7864
Mary Ellen SCHATTMAN, Plaintiff-Appellee,
v.
TEXAS EMPLOYMENT COMMISSION et al., Defendants-Appellants.
 No 71-1872.
 United States Court of Appeals,
Fifth Circuit.
 March 1, 1972.
As Amended March 17, 1972.
Rehearing and Rehearing En Banc Denied June 5, 1972.
 
 Jack Sparks, J. C. Davis, Sam Lane, Asst. Attys. Gen., Crawford C. Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., Samuel D. McDaniel, Staff legal Asst., Austin, Tex., for defendants-appellants.
 Phillip B. Sklover, Office of the Gen. Counsel, Equal Employment Opportunity Comm., Washington, D. C., Robert H. Alvis, David G. Stubbeman, Abilene, Tex., for Timex Corp., amicus curiae; Wagstaff, Alvis, Alvis & Leonard, Abilene, Tex., of counsel.
 Stanley P. Hebert, Gen. Counsel, John de J. Pemberton, Jr., Deputy Gen. Counsel, Julia P. Cooper, Chief, Appellate Section, Philip B. Sklover, David W. Zugschwerdt, Attys., E.E.O.C., Washington, D. C., for the United States Equal Employment Opportunity Comm. amicus curiae.
 Nancy E. Stanley, Atty., E.E.O.C., Washington, D. C., on brief in support of petition for rehearing en banc.
 David R. Richards, Clinton & Richards, Austin, Tex., for plaintiff-appellee.
 Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.
 COLEMAN, Circuit Judge:
 
 
 1
 This is a case in which a former employee of the Texas State Employment Commission attacked the employer's longstanding policy of terminating employment of pregnant female employees two months prior to expected delivery date. It was alleged that the policy violated the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. The District Court so held, 330 F.Supp. 328 (W.D., Texas, 1971). We reverse.
 
 
 2
 * Since 1956 the Employment Commission has maintained the following policy with reference to female employees from and after the seventh month of pregnancy:
 
 
 3
 "No employee anticipating maternity confinement may remain in active service with the commission later than two months before the expected delivery date. An earlier separation will be required if the employee's physical condition interferes with satisfactory performance of her normal and customary work assignments.
 
 
 4
 "Each employee anticipating maternity confinement shall, at the earliest practicable time, inform her immediate supervisor of the expected date of confinement and the name of her attending physician. This information, along with a specific description of the employee's work assignments, will be transmitted through channels to the Personnel Office. The appropriate Department Head or District Director shall thereafter, as circumstances warrant, make recommendations consistent with the purposes of this policy.
 
 
 5
 "An employee separated from the payroll in good standing under this policy, may, upon written application, be granted maternity leave without pay for a period not to exceed six months. If, at the end of that time, she has neither resigned nor been reinstated, she may request in writing one extension of not more than six months. Failure to apply for reinstatement or refusal of reinstatement offered before the expiration of an approved leave of absence will be treated as voluntary resignation.
 
 
 6
 "Reinstatement following maternity leave is not automatic. Each request for reinstatement will be reviewed and acted upon after consideration of current personnel needs and the employees' previous work record with the commission."
 
 
 7
 In April, 1969, Mrs. Schattman was employed by the Texas Employment Commission as an employment interviewer, with the understanding that she would be trained to be a labor market analyst. In December, 1969, after the completion of the necessary courses of instruction, Mrs. Schattman was promoted to the position of Labor Market Analyst I. Her duties as a labor market analyst involved essentially desk work. Her work station consisted of two desks, one where she wrote and the other, containing a calculator and an adding machine, where she worked up computations. None of her duties required public contact, and the only physical exertion involved in her job was the lifting of file folders. It was stipulated by the appellants that Mrs. Schattman was a qualified employee and that her services as an employee were satisfactory.
 
 
 8
 In December, 1969, Mrs. Schattman advised her immediate supervisor, Mrs. Ivy Maude Smith, that she was pregnant and that the expected date of birth was around August 1, 1970. Thereafter, Mrs. Smith gave Mrs. Schattman a copy of the Texas Employment Commission's maternity leave policy. Notwithstanding this maternity leave policy Mrs. Schattman expressed her desire to continue working until two weeks before the expected date of delivery. Previously, she had been advised by her obstetrician that no reason existed to prevent her from working until two weeks before her expected date of delivery.
 
 
 9
 Anticipating a total absence from her job of six weeks-two weeks before delivery and four weeks after birth-Mrs. Schattman also discussed with Mrs. Smith an arrangement whereby she would complete much of her work in advance of her confinement, whereby she would train a clerk to do the necessary posting during her anticipated absence.
 
 
 10
 On April 22, 1970, Mrs. Smith sent the following interoffice memorandum to E. C. Logsdon, District Director of the Texas Employment Commission, relative to Mrs. Schattman:
 
 
 11
 "Reference is made to my memo of 12-4-69 notifying you of the subject employee's expected maternity confinement.
 
 
 12
 "A month ago, her physician told her he saw no reason why she could not work up to two weeks before expected confinement. She plans to seek temporary work elsewhere after TEC's seven month requirement.
 
 
 13
 "In view of the fact our maternity leave policy is some 14 years old, is it possible that this restriction has been relaxed?
 
 
 14
 "Mary Ellen does not work with the public, but is an analyst in the District Office working at a desk. The work is not of a nature to appear that it would harmful to her to continue past seven months. Once a month she prepares a report and makes one count in the local office, but this is done in the closing hours of the day, 4 P.M., or early in the morning in a booth. We are now training the clerk to do this work as a back up to the analyst during absence, even though the analyst will continue to prepare on regular basis because of information we are able to pick up which is helpful in analysis."
 
 
 15
 Thereafter, Mrs. Schattman was advised that the maternity leave policy of the Texas Employment Commission would be strictly enforced and that her active employment with the Commission would be closed on June 1, 1970. The Personnel Director of the Commission testified that Mrs. Schattman's employment termination was occasioned simply by the automatic application of the maternity leave policy of the Commission, that no medical opinions were considered, and that the requirements of her job as Labor Market Analyst I were likewise deemed immaterial.
 
 
 16
 On April 29, 1970, Mrs. Schattman filed her complaint with the Equal Employment Opportunity Commission.
 
 
 17
 On May 10, 1970, Mrs. Schattman wrote to Mrs. Nancy Sayers, Chairman and Executive Director of the Texas Employment Commission:
 
 
 18
 "I am a labor market analyst in the Austin District Office. On April 24, 1970, I was informed by my supervisor that May 29, 1970, would be my last day active duty under the TEC maternity leave policy. My expected date of confinement is August 1, 1970, and the doctor anticipates no reason why I could not work until two weeks prior to that date. Attempts were made through channels to secure a regular leave without pay which would allow me to continue until mid-July. Mr. Speer made the final decision on April 23, that the policy would be observed.
 
 
 19
 "I have filed a charge with the Equal Employment Commission protesting the TEC's maternity leave policy as violative of the 1964 Civil Rights Act, Title VII, prohibitions against discrimination according to sex.
 
 
 20
 "I will not voluntarily sign the separation report. Nevertheless, I wish to preserve my rights to reinstatement, and I will therefore sign the form only if ordered to do so.
 
 
 21
 "I regret that my action is necessary, but I wish to be a career employee and I do not feel that my condition warrants such a long disruption of my work."
 
 Mrs. Sayers replied on May 14, 1970:
 
 22
 "You (sic) letter of May 10, 1970, indicates you may have some misunderstanding of the Commission's maternity leave policy on two points. First, the policy stipulates that no employee anticipating maternity confinement may remain in active service with the Commission later than two months before the expected delivery date. Second, reemployment is not automatic. Each request for reemployment is received and acted upon after consideration of current personnel needs and the employee's previous record with the Commission. Reemployment after separation from the payroll for any reason, including maternity, is at the discretion of the Commission in accordance with the Merit System Regulation.
 
 
 23
 "The Commission's maternity leave policy was adopted in 1956 after consideration of many factors including medical opinion, employee welfare, employee efficiency, and practices of other organizations, both public and private. The Commission believes it to be in the best interest of the employee and the agency. I am sorry that you do not agree.
 
 
 24
 "Please do not be concerned about having to sign a separation report. Employees are not required to sign these reports."
 
 
 25
 Being unsuccessful in her efforts to maintain her employment past the seventh month termination date, Mrs. Schattman's employment was terminated on May 29, 1970, pursuant to the maternity leave policy. The position remained vacant for over five weeks before another employee was permanently assigned to her job. After being discharged, and before the birth of her child on July 20, 1970, Mrs. Schattman unsuccessfully sought temporary employment and, failing to find employment, she thereafter enrolled in a real estate course at the University of Texas.
 
 
 26
 Mrs. Schattman received notice on July 28, 1970, from the Equal Employment Opportunity Commission of her right to institute suit in Federal District Court against the Texas Employment Commission.
 
 
 27
 The next day suit was filed against the appellants in the United States District Court, claiming that the termination of her employment violated Title VII of the Civil Rights Act of 1964, the requirements of merit employment upon the Texas Employment Commission by federal statute, and the Fourteenth Amendment to the United States Constitution. Specifically, in terms of relief, Mrs. Schattman sought a preliminary or permanent injunction, restraining the appellants from maintaining any policy, practice, custom or usage of discrimination against her and other females similarly situated because of sex with respect to hiring, terms, conditions, and privileges of employment; declaratory relief declaring the maternity leave policy of the Texas Employment Commission to be in violation of Title VII of the Civil Rights Act of 1964; furthermore, damages for loss of earnings and injunctive relief requiring her reinstatement to employment with the Texas Employment Commission.
 
 
 28
 Within a month after the delivery of her child, Mrs. Schattman was offered employment at the same salary in San Antonio, Dallas, and five other places, but she declined because she did not wish to leave Austin. However, in January, 1971, she accepted an offered position of "employment interviewer" with the Texas Employment Commission in Houston at the same salary she was receiving when she took her leave of absence less than two months before her baby was born. The Houston job necessitated that Mrs. Schattman's husband secure permission to complete his final semester of law school out of residence, which required him to enroll in both the University of Texas and the University of Houston and to complete his final courses by correspondence.
 
 II
 
 29
 On February 25, 1971, the District Court decided the case. We quote from the reported decision, 330 F.Supp. at 329:
 
 
 30
 "By virtue of female physiology, the Defendants' policy applies solely to women. Women are terminated not because of their unwillingness to continue work, their poor performance, or their need for personal medical safety, but because of a condition attendant to their sex. This is the very type of discriminatory regulation condemned by the interpretive regulations of the Equal Employment Opportunity Commission. 29 C.F.R. Sec. 1604.1(a) provides in part that
 
 
 31
 The principle of non-discrimination requires that individuals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group.
 
 
 32
 In view of this provision, Richards v. Griffith Rubber Mills, 300 F.Supp. 338, 340 (D.Or.1969), concluded that 'the law no longer permits either employers or the states to deal with women as a class in relation to employment to their disadvantage'.
 
 
 33
 "Although Defendants' policy is thus violative of 42 U.S.C. Sec. 2000e-2 (a), it can be sustained by showing under 2000e-2(e) that it 'is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise'. To prevail under this exception, according to Weeks v. Southern Bell Telephone & Telegraph, 408 F.2d 228, 235 (5th Cir. 1969),
 
 
 34
 * * * an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.
 
 
 35
 Defendants clearly did not sustain their burden under this exception. They based their policy on mere historical reasons, which have not been reexamined for fourteen years. This Court is convinced that there was not such an impairment of efficiency, if any, as to justify TEC's outmoded policy. Indeed, defendants took almost as much time to replace Mrs. Schattman as would have been required by her doctor for the childbirth and recovery.
 
 
 36
 "For the foregoing reasons, plaintiff's request for relief declaring the defendants' maternity leave policy invalid is accordingly granted, and defendants are permanently enjoined from maintaining this policy. This is not to say that TEC or any other employer cannot have such a policy based on individual medical or job characteristics, but it does mean that broad policies not so justified are contrary to law."
 
 
 37
 Mrs. Schattman was awarded judgment for $1,103.72 back pay and attorney's fees in the sum of $500.
 
 
 38
 Subsequently, 330 F.Supp. at 330, the Court rejected the contention of the Texas Employment Commission that as to its own employees it was not covered by the Act because of the terms of 42 U.S.C. Sec. 2000e(b).
 
 
 39
 This Court is accordingly confronted with two questions: (1) Is the Texas Employment Commission an employer subject to the sex discrimination provisions of Title VII of the Civil Rights Act of 1964; (2) Is the regulation in question reasonable within the requirements of the Equal Protection Clause of the Fourteenth Amendment?
 
 
 40
 By this time, we are well aware of the proscriptions of Title VII of the Civil Rights Act of 1964.
 
 
 41
 "Title VII generally forbids in the context of employment, discrimination against any individual 'because of such individual's race, color, religion, sex, or national origin'. The Act's proscriptions are directed at employers, employment agencies, and labor organizations, each of which is forbidden to engage in certain defined 'unlawful employment practices'. See Title 42, U.S.C.A. Secs. 2000e-2, 2000e-3." Sanchez v. Standard Brands, Inc., 5 Cir., 1970, 431 F.2d 455, 457.
 
 
 42
 Title 42, U.S.C. Sec. 2000e-2(a), provides:
 
 
 43
 "It shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."
 
 
 44
 Nevertheless, Title 42, U.S.C. Sec. 2000e (b) (1) defines an employer as any person engaged in an industry affecting commerce who has twenty-five or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include the United States, a corporation wholly owned by the Government of the United States, an Indian Tribe, or a state or political subdivision thereof (emphasis added).
 
 
 45
 Counsel for the Equal Employment Opportunity Commission, amicus curiae, stated on oral argument that there is no "satisfactory" legislative history as to the exclusion of states and political subdivisions from employer status. We can only deduce from this that there was no dispute about this exclusion as the proposed legislation coursed its way toward enactment. Everyone must have understood what it meant for the exclusion is stated in clear and unmistakable terms.[1]
 
 
 46
 It is conceded that the Texas Employment Commission is an agency of the State of Texas. It necessarily follows that under the plain terms of the foregoing exemption the Commission is not an employer covered by the Act.
 
 
 47
 But it is argued that the Texas Employment Commission is an employment agency, which it undoubtedly is under the terms of 42 U.S.C. Sec. 2000e, and that 42 U.S.C. Sec. 2000e-2(b) shears the Commission of the exclusion otherwise prescribed for other state agencies in that the section provides:
 
 
 48
 "It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin."
 
 
 49
 In its amicus curiae brief the Equal Employment Opportunity Commission concedes that "The legislative history is silent on the meaning of the statutory phrase 'or otherwise to discriminate against any individual' as used in Sec. 703 (b) of the Act". The Commission argues, nevertheless, that this language removes the Employment Commission from the exclusion of state agencies as employers.
 
 
 50
 We cannot escape the fact that Congress in 42 U.S.C. Sec. 2000e(b) (1) unequivocally declares that a state or subdivision thereof is not an employer within the meaning of the Act.
 
 
 51
 Does the language of Sec. 2000e-2(b) destroy the exclusion? It does not say so. The key words in the section deal with "reference for employment" and "individuals". Employees are not mentioned. Had an exception to the exclusion been desired or intended it would have been an easy matter to use clarifying language such as "notwithstanding the provisions of Sec. 2000e(b) (1)", or it could have included the word "employees" in addition to "individuals".
 
 
 52
 After granting in plain and unmistakable terms an exclusion to all state agencies, did Congress withdraw it from one agency by the language here under consideration? With no legislative history to support such a result, does an ambiguity extinguish provisions already plainly expressed? The Supreme Court has given some guidance for statutory construction under such circumstances.
 
 
 53
 Bouie v. City of Columbia, 1964, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894, was a Civil Rights case involving criminal trespass but the Court quoted Mr. Chief Justice Marshal:
 
 
 54
 "The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so [United States v. Wiltberger, 5 Wheat. 76, 96, 5 L.Ed. 37]."
 
 
 55
 While the case before us is not a criminal case, the construction sought by Mrs. Schattman would have us hold that although it did not say so Congress intended the Act to cover one very small group of state employees while leaving out the others, that is, treating a small group one way and the others differently, all within the mutual framework of an Act designed to secure equality. This within itself would be a patent inequality, a contradiction, the very thing that Congress set out to correct where it thought corrective action should be exercised.
 
 
 56
 In another case where the United States unsuccessfully sought to condemn jam as misbranded, it was held that in construing an Act of Congress Courts must construe what Congress has written and cannot add, subtract, delete, or distort the words Congress chose to use, 62 Cases More or Less, Each Containing Six Jars of Jam v. United States, 1951, 340 U.S. 593, 71 S.Ct. 515, 95 L.Ed. 566.
 
 
 57
 Again, the Court has stated that a suggested implication cannot be allowed to prevail against the express words of a statute, Wright v. Blakeslee, 1879, 101 U.S. 174, 25 L.Ed. 1048.
 
 
 58
 In the absence of any legislative history to the contrary, we look to the plain language of Congress and hold that the State of Texas is not an employer whose employees are covered by the Act and this includes all employees alike. The Texas Employment Commission as a state agency was excluded from coverage, Sec. 2000e(b) (1), and the District Court was without jurisdiction of this complaint as a purported violation of the Civil Rights Act of 1964.
 
 III
 
 59
 A woman, like any other person, is entitled to the Equal Protection of the law and Due Process of law. There is no necessity to repeat here the splendid passages written in numerous decisions for the purpose of making these principles crystal clear.
 
 
 60
 The question is: How does Equal Protection or Due Process apply to Mrs. Schattman's situation?
 
 
 61
 It must initially be observed that the Texas Employment Commission hired Mrs. Schattman regardless of her sex and trained her. After she had recovered from her pregnancy and confinement, and although she had a suit pending against it, the Commission again offered her employment at the same salary, although in other Texas cities where there was an available opening. It did not terminate her employment because she was a woman or because she became pregnant but only because her pregnancy was far advanced. Mrs. Schattman says the Constitution requires that a state agency with many female employees shall treat every woman on an individual basis even after seven months of pregnancy. She contended before the Commission and she argues here that she could work up until two weeks prior to her expected confinement but the record shows that she was actually delivered of her child ten days before the expected date. Is it constitutionally required of a state agency or any other employer of many females that they shall make a daily, or even momentary, evaluation of the condition and hazards of its pregnant female employees after they reach the far advanced stage?
 
 
 62
 Is it conducive to the reasonably efficient operation of a state agency that it should involve itself in strife, discord, unhappiness, jealousies, and recriminations caused by allowing one woman to work through the eighth or ninth month of pregnancy as a matter of opinion on the part of some supervisor while requiring another to stop at the end of the seventh?
 
 
 63
 The record shows that the Commission has 3,600 employees, although the numerical division between male and female was not stated.
 
 
 64
 Dr. Emerson K. Blewett testified below that he was Mrs. Schattman's doctor, that it would be "physically possible" for her to continue her employment until within two weeks of confinement; that a woman seven months pregnant can do as much work as one who is not pregnant; that, in fact, Mrs. Schattman could work until the day of her delivery; and that it would present no problem.
 
 
 65
 On the other hand, the Court also heard the testimony of Dr. M. D. McCauley, an obstetrician and gynecologist, a graduate of the University of Michigan, who was then fifty-eight years old and had practiced medicine thirty-four years. He had presided at the delivery of over 10,000 babies. For eighteen years he had been Chief of the Obstetrical Division at Seton Hospital.
 
 Dr. McCauley said:
 
 66
 "We have some thirty-two susceptible young women there who are a constant problem in all phases of their work, starting in the last trimester of pregnancy."
 
 
 67
 Dr. McCauley further testified that there is a change in the efficiency of a working woman after the sixth or seventh month of pregnancy; that, in his opinion, a regulation releasing women from their employment after the sixth or seventh month of pregnancy was reasonable; that in a woman after reaching the seventh month swelling of the limbs is very prevalent, especially in the summer; their ability to get around necessitates help and assistance from other employees; jobs they had been able to do themselves they now require help with, or they are unable to do them; they are frequently given to headaches, little irritable things; their personalities change quite a bit; and they are not only hard to live with but they are hard to employ. He further testified that women in that condition are frequently running to the bathroom or after a small bite of food or to loosen their garments because they are too tight.
 
 
 68
 The District Court made no findings as between the testimony of Dr. Blewett and Dr. McCauley. He held that "by virtue of female physiology the Defendants' policy applies solely to women". This is no doubt true but the fact that only a woman can be pregnant does not nullify the pregnancy nor the ensuing physical conditions.
 
 
 69
 The record further shows that one Texas agency terminates its women employees at the end of the fifth month of pregnancy and others at the end of six months. Still others terminate at the end of the seventh month.
 
 
 70
 The most recent case before the Supreme Court on State classification by sex is Reed v. Reed, decided November 22, 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225.
 
 
 71
 It was there stated, 92 S.Ct. at 251, that in applying the Equal Protection Clause the Supreme Court has consistently recognized that the Fourteenth Amendment does not deny the States the power to treat different classes of persons in different ways. The Clause does prohibit the States from placing people in different classes "on the basis of criteria wholly unrelated to the objective of that statute" [in our case, a regulation]. Additionally, the Supreme Court said, "A classification 'must be reasonable, not arbitrary, and must rest on some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike"'. The conclusion was that dissimilar treatment for men and women who are similarly situated violates the Equal Protection Clause.
 
 
 72
 We are also aware that the Supreme Court has said in comparatively recent times (1960) that "a statutory [regulatory] discrimination will not be set aside if any facts reasonably may be conceived to justify it", McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.
 
 
 73
 See, also, an older case, Lindsley v. National Carbonic Gas Co., 1911, 220 U.S. 61, 78-79, 31 S.Ct. 337, 55 L.Ed. 369, cited in Reed, supra, and the decision of the Three Judge Court, 316 F.Supp. 134, 136 [Judges Haynesworth, Hemphill, and Russell] dealing with a man claiming that he had a constitutional right to gain admission to a college maintained exclusively for girls:
 
 
 74
 "The Equal Protection Clause of the Fourteenth Amendment does not require 'identity of treatment' for all citizens (Walters v. City of St. Louis (1954) 347 U.S. 231, 237, 74 S.Ct. 505, 98 L.Ed. 660), or preclude a state, by legislation, from making classifications and creating differences in the rights of different groups (Griffin v. Board of Sup'rs of Prince Edward County (1964) 377 U.S. 218, 230, 84 S.Ct. 1226, 12 L.Ed.2d 256). It is only when the discriminatory treatment and varying standards, as created by the legislative or administrative classification are arbitrary and wanting in any rational justification that they offend the Equal Protection Clause. (McGowan v. Maryland (1961) 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393). Specifically, a legislative classification based on sex, has often been held to be constitutionally permissible. See West Coast Hotel Co. v. Parrish (1937) 300 U.S. 379, 394-395, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330 (statute providing minimum wages for women but not men); Radice v. New York (1924) 264 U.S. 292, 296-298, 44 S.Ct. 325, 68 L.Ed. 690 (special statute limiting hours of night work of women in cities with a particular population); Goesaert v. Cleary (1948) 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (proscribing use of women as licensed bartenders) (cf. McCrimmon v. Daley (7 Cir. 1969) 418 F.2d 366, 369-371; and Seidenberg v. McSorleys' Old Ale House, Inc. (D.C.N.Y.1969) 308 F. Supp. 1253, 1260 * * *); Hoyt v. Florida, 1961, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (jury duty voluntary for women but compulsory for men). (On the other hand, a complete proscription of women jurors is violative of constitutional rights. White v. Crook (D.C.Ala.1966) 251 F. Supp. 401, 408); Miskunas v. Union Carbide Corporation, 7 Cir. 1968, 399 F.2d 847, 850, cert. denied 393 U.S. 1066, 89 S.Ct. 718, 21 L.Ed.2d 709 (denial to wife, but not to husband, of right to recover for loss of consortium). (See, however, Kanowitz, Constitutional Aspects of Sex-based Discrimination in American Law, 48 Neb.L.Review 131, 143-151 (1968). This article, it seems, was written prior to the denial of certiorari in Miskunas); Gruenwald v. Gardner (2nd Cir. 1968) 390 F.2d 591, cert. denied 393 U.S. 982, 89 S.Ct. 456, 21 L. Ed.2d 445 (women given more favorable treatment in social security benefits than men); United States v. St. Clair (D.C.N.Y.1968) 291 F.Supp. 122 (men subject, women not, under Selective Service Act); Clarke v. Redeker (D.C.Iowa 1966) 259 F.Supp. 117 (fixing wife's residence by husband's but not the reverse); Heaton v. Bristol (Tex.Civ.App.1958) 317 S.W.2d 86, cert. denied 359 U.S. 230, 79 S.Ct. 802, 3 L.Ed.2d 765 and Allred v. Heaton (Tex.Civ.App.1960) 336 S.W.2d 251, cert. denied 364 U.S. 517, 81 S.Ct. 293, 5 L.Ed.2d 265 (both involving denial of right of women to attend an all-male state-supported college).
 
 
 75
 Conversely, sex-based classifications have been nullified when no persuasive difference between women and men could be offered to justify the difference in treatment. See, e. g. United States ex rel. Robinson v. York, D.Conn., 1968, 281 F.Supp. 8, involving the invalidation of a statute providing that women, but not men, could be committed to the state farm for indefinite terms exceeding the statutory maximum provided by the substantive statutes under which they were convicted; White v. Crook, M.D., Ala., 1966, 251 F.Supp. 401, declaring unconstitutional a statute excluding women from jury service; Karczewski v. Baltimore and Ohio Railroad Company, D.C., Ill., 1967, 274 F.Supp. 169, overturning the Indiana practice of denying women the right to sue for loss of consortium (cited above).
 
 
 76
 In the light of the foregoing, we hold that Mrs. Schattman has failed in her efforts to show that the Regulation in question is unreasonable or arbitrary or not reasonably related to a permissible state objective. To the contrary, we are of the view that the Regulation is shown to be reasonable and rationally related to a permissible state purpose. See Struck v. Secretary of Defense, 9 Cir., 1971, 460 F.2d 1372, and Miller v. Industrial Commission, 1971, 480 P.2d 565.
 
 
 77
 The judgment of the District Court is reversed and the case is remanded with directions to dismiss the complaint.
 
 
 78
 Reversed and remanded, with directions.
 
 WISDOM, Circuit Judge (dissenting):
 
 79
 I cannot agree with the Court's conclusion that the Texas Employment Commission's own employment practices are beyond the scope of the coverage of Title VII.
 
 
 80
 A specific provision of the Act, Sec. 2000e-2(b), prohibits discrimination by employment agencies.[1] A corresponding definitional section tells us just what an "employment agency" is.[2] The definitional section, Sec. 2000e(c), excludes from the definition of an "employment agency" any "agency of a state," but excluded from the exclusion-that is, precisely covered by the definition-is "the system of State and local employment services receiving Federal assistance." The TEC has never denied the allegation of Mrs. Schattman's complaint that TEC is "charged with the responsibility of administering in the State of Texas the 'national system of employment offices' authorized by the Wagner-Peyser Act, 29 U.S.C., Section 49, et seq." TEC is, then, directly covered by the language of the "employment agency" definition.
 
 
 81
 Consequently, the question presented by Mrs. Schattman's case is not one of coverage, but rather one of the meaning of the substantive requirements imposed on federally-assisted state employment agencies. It is clear from the language of Sec. 2000e-2(b) that the referral practices of covered agencies are subject to a requirement of non-discrimination. The question before us is whether the in-house employment practices of covered employment agencies are likewise subject to the requirement of non-discrimination. The district court properly argued that the language of Sec. 2000e-2 (b) making it unlawful "otherwise to discriminate against" an individual was meant to bring the in-house employment practices of covered employment agencies within the prohibition of non-discrimination. Otherwise, the district court reasoned, the phrase would be completely redundant.
 
 
 82
 To me, the conclusion reached by the district court is unassailable. First, it tracks closely the language of the statute, language about as explicit as a statute can be. Second, I have grave doubts that Congress could license discriminatory employment practices by a state agency that was the recipient of federal funds, consistent with the equal protection obligations imposed on the federal government through the Due Process Clause of the Fifth Amendment. Finally, reading the act to prohibit in-house discrimination by covered state employment agencies seems necessary to avoid the anomalous conclusion the Court reaches today. It seems incredible to me that Congress could have intended to ban discriminatory referral practices by federally-funded state employment agencies while allowing those agencies to discriminate under their own roofs.
 
 
 83
 The Court never really explains why it refuses to impose the statutory ban on "otherwise discriminating" on TEC, a federally-funded state employment agency forthrightly included within the Act's coverage. The Court says a good deal about the "plain meaning" of the exclusion for state agencies from the definition of an "employer." But at the same time it ignores the plain meaning of the provisions defining a covered "employment agency" and setting forth the obligations imposed on covered agencies. In short, the Court has focused on the general definition of an "employer" but has failed to recognize that another more specific section of the Act deals with the special class of employers called employment agencies.
 
 
 84
 Because I believe that TEC is covered by Title VII, I would reach the question whether a uniform policy requiring pregnant females to terminate their employment no later than two months before child delivery violates Title VII. Female employees are the only employees of TEC who become pregnant; it follows that they are provisionally dismissed from work on account of their sex-a violation of Sec. 2000e-2(a). At trial, TEC had the burden of proving that this discrimination is, under Sec. 2000e-2(e), "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." The district court explicitly found that TEC had not proved "reasonable cause to believe . . . that all or substantially all women would be unable to perform safely and efficiently" beyond the seventh month of pregnancy. Weeks v. Southern Bell Telephone & Telegraph Co., 5 Cir. 1969, 408 F.2d 228, 235. This conclusion is fully supported in the record, and I see no basis for discarding it on appeal. In my view, Mrs. Schattman stated and proved a violation of Title VII by TEC. As a result, it is unnecessary for me to decide whether the TEC violated the Equal Protection Clause as well.
 
 
 85
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 86
 The Petition for Rehearing is denied and no member of this panel or Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 WISDOM, Circuit Judge (dissenting):
 
 87
 I dissent for the reasons stated in my dissent from the original opinion of the panel.
 
 
 
 [1]
 The House Judiciary Committee Report construed the definition of employer (U. S. Code Congressional and Administrative News, 1964, page 2402:
 "'Employer' is defined to mean a person engaged in an industry affecting commerce who has 25 or more employees, except that during the first year after the date the enforcement provisions of the title become operative employers having fewer than 100 employees will not be covered, and during the second year after such date, employers with fewer than 50 will not be covered. The definition excludes from the term 'employer' all Federal, State, and local government agencies and bona fide membership clubs (other than labor organizations) which are tax exempt under the Internal Revenue Code (sec. 702(b))."
 Immediately following in the Committee Report is the definition of "employment agency":
 "'Employment agency' is defined to mean any person who regularly undertakes to procure employees for an employer or to procure, for employees, opportunities to work. The U. S. Employment Service and the system of State and local employment services receiving Federal assistance are specifically included (sec. 702(c))."
 
 
 [1]
 Section 2000e-2b provides:
 It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.
 
 
 [2]
 Section 2000e(c) provides:
 The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person; but shall not include an agency of the United States, or an agency of a State or political subdivision of a State, except that such term shall include the United States Employment Service and the system of State and local employment services receiving Federal assistance.