Mrs. Susan **COHEN**, Appellee,

v.

**CHESTERFIELD COUNTY SCHOOL
BOARD** and **Dr. Robert F. Kelly**,
Appellants,

Equal Employment Opportunity Com-
mission, Amicus Curiae.

No. 71–1707.

United States Court of Appeals,
Fourth Circuit.

Resubmitted Jan. 2, 1973.

Decided Jan. 15, 1973.

Certiorari Granted April 23, 1973.
See 93 S.Ct. 1925.

Winter, Circuit Judge, dissented
and filed opinion in which Craven, and
Butzner, Circuit Judges, joined.

———◆———

Samuel W. Hixon, III, Richmond, Va.
(Williams, Mullen & Christian, Rich-
mond, Va., and Frederick T. Gray, Rob-
ert E. Eicher, Richmond, Va., Oliver D.
Rudy and Morris E. Mason, Chester-
field, Va., on brief), for appellants.

Philip J. Hirschkop, Alexandria, Va.
(John B. Mann, Richmond, Va., on
brief), for appellee.

John de J. Pemberton, Jr., Acting
Gen. Counsel, Julia P. Cooper, Chief,
Appellate Section, Ed Katze, Dist. Atty.,
Washington District Office, Washing-
ton, D. C., on brief, for E. E. O. C.

Before HAYNSWORTH, Chief Judge,
and WINTER, CRAVEN, BUTZNER,
RUSSELL, FIELD and WIDENER,
Circuit Judges, en banc.

HAYNSWORTH, Chief Judge:

In this action brought under 42 U.S.C.
§ 1983, the plaintiff challenges the ma-
ternity leave regulation of the Chester-
field County School Board on the ground
that it deprives her of her rights to due
process and to equal protection of the
laws guaranteed under the Fourteenth
Amendment to the Constitution.[1]  The

1.  Mrs. Cohen's complaint sought relief also
under the Equal Employment Opportunity
Act, Title VII of the Civil Rights Act
of 1964, 42 U.S.C. § 2000e–2(a) :

"It shall be an unlawful employment
practice for an employer—
(1) to fail or refuse to hire or to dis-
charge any individual, or otherwise to

challenged rule requires, with limited flexibility, that teachers who become pregnant must go on maternity leave at the end of the fifth month of pregnancy.[2] This appeal is taken from the District Court's decision that the maternity leave rule deprived Mrs. Cohen of equal protection: "Because pregnancy, though unique to women, is like other medical conditions, the failure to treat it as such amounts to discrimination which is without rational basis, and therefore is violative of the equal protection clause of the Fourteenth Amendment." Cohen v. Chesterfield County School Board, E.D.Va., 326 F.Supp. 1159, 1161.

When Mrs. Cohen became pregnant she was a social studies teacher at Midlothian High School in Chesterfield County. Her contract with the School Board required her to comply with all state and local school laws and regulations. In compliance with the Board's maternity provisions, Mrs. Cohen notified the Board on November 2, 1970 that she was pregnant and that her estimated date of delivery was April 28, 1971. With the written opinion of her obstetrician that she could work as long as she chose, she requested an extension until April 1, 1971 of the date she would stop teaching. The School Board denied this request, granting her leave effective December 18, 1970. In a subsequent personal appearance before the Board, Mrs. Cohen made an alternate request of an extension until January 21, 1971—the end of the semester. This request, supported by a recommendation of her principal, was also denied. The District Court found that the basis of the denials of the requested extensions was that "the School Board had a replacement

---

discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;
\* \* \*."
At the time of the proceedings below, however, state agencies and educational institutions were specifically exempted from the Act. 42 U.S.C. § 2000e(b); 42 U.S.C. § 2000e–1. Subsequent to oral argument, these exemptions were repealed by the Equal Employment Opportunity Act of 1972, P.L. 92–261, signed by the President March 24, 1972 and effective immediately. Rules and practices of the defendant in effect when the defendant was exempt from the Equal Employment Opp. Act cannot be the basis for a violation of that Act. This opinion accordingly is limited to consideration of the rights and liabilities of the parties under the Equal Protection Clause of the Fourteenth Amendment.

2. The maternity leave provisions of the Chesterfield County School Board provides:
"a. Notice in writing must be given to the School Board at least six (6) months prior to the date of expected birth.
b. Termination of employment of an expectant mother shall become effective at least four (4) months prior to the expected birth of the child. Termination of employment may be extended if the superintendent receives written recommendations from the expectant mother's physician and her principal, and if the superintendent feels that an extension will be in the best interest of the pupils and school involved.
c. Maternity Leave
1. Maternity leave must be requested in writing at the time of termination of employment.
2. Maternity leave will be granted only to those persons who have a record of satisfactory performance.
3. An individual will be declared eligible for re-employment when she submits written notice from her physician that she is physically fit for full-time employment, and when she can give full assurance that care of the child will cause minimal interference with job responsibilities.
4. Re-employment will be guaranteed no later than the first day of the school year following the date that the individual was declared eligible for re-employment.
5. All personnel benefits accrued, including seniority, will be retained during maternity leave unless the person concerned shall have accepted other employment.
6. The school system will have discharged its responsibility under this policy after offering re-employment for the first vacancy that occurs after the individual has been declared eligible for re-employment.

available, and felt it proper to abide by its regulation."

The plaintiff asserts no claim of arbitrariness in the denial of the alternative request of an extension until January 21, 1971. She has made no attempt to show that a qualified replacement would have been as readily available then, or in April, as in December. She stands squarely on a broader constitutional claim which would entirely exclude school officials from participation in the decision on the date of the maternity leave. That is for her, alone, to determine, she says, else she is subject to impermissible discrimination based upon sex.

We conclude, first, that the regulation is not an invidious discrimination based upon sex. It does not apply to women in an area in which they may compete with men. Secondly, school officials have a duty to provide, as best they can, for continuity in the instruction of children and, to that end, they have a legitimate interest in determining reasonable dates for the commencement of maternity leaves and a right to fix them.

We do not accept Mrs. Cohen's premise that the regulation's provision which denies her, with the advice of her doctor, the right to decide when her maternity leave will begin is an invidious classification based upon sex which may be justified only by some compelling state interest. Such invidious discriminations are found in situations in which the sexes are in actual or potential competition. A statutory preference for men over women in the appointment of administrators was recently stricken by the Supreme Court as quite unjustified by considerations of administrative convenience.[3]

Only women become pregnant; only women become mothers. But Mrs. Cohen's leap from those physical facts to the conclusion that any regulation of pregnancy and maternity is an invidious classification by sex is merely simplistic. The fact that only women experience pregnancy and motherhood removes all possibility of competition between the sexes in this area. No man-made law or regulation excludes males from those experiences, and no such laws or regulations can relieve females from all of the burdens which naturally accompany the joys and blessings of motherhood. Pregnancy and motherhood do have a great impact on the lives of women, and, if that impact be reasonably noticed by a governmental regulation, it is not to be condemned as an invidious classification.

We are not accustomed to thinking, as sex classifications, of statutes making it a crime for a man forcefully to ravish a woman, or, without force, carnally to know a female child under a certain age. Military regulations requiring all personnel to be clean shaven may be suspect on other grounds, but not because they have no application to females. Prohibition or licensing of prostitution is a patent regulation of sexual activity, the burden of which falls primarily on females, but it has not been thought an invidious sex classification. What of regulations requiring adult women sunning themselves on a public beach to keep their breasts covered? Is that an invidious discrimination based upon sex, a denial of equal protection because the flat and hairy chest of a male lawfully may be exposed?

The situation confronting us is not unlike that which occasioned the memorable lament of Anatole France, "the law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread."[4] Concern that the weight of the law falls more heavily upon the poor has been with us for years. Undoubtedly, some laws are directed to offenses which are unlikely to be committed by the wealthy, but there are also crimes which no poor person could com-

3. Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225.

4. A. France, The Red Lily (1894).

mit. If the rich are unlikely to find spaces beneath bridges havens of rest, poor people are unlikely to find an opportunity to embezzle the funds of a national bank[5] or to perpetrate a stock fraud.[6] There are some laws which are not likely to be violated by the rich; there are others which are not likely to be violated by the poor. France stated his lament as he looked at some of such laws from the perspective of the poor, but the law may hold all of us accountable for antisocial conduct despite the differences in the temptations which confront us.

How can the state deal with pregnancy and maternity in terms of equality with paternity? It cannot, of course. The disabilities and preoccupations of maternity are visited but slightly upon the father. However sympathetic he may be, it is she who must shoulder the principal problems of pregnancy, the labors of childbirth and the care and feeding of the child in the early months of its life.

█ Pregnancy and maternity are *sui generis*, and a governmental employer's notice of them is not an invidious classification by sex.

Still, the regulation must serve some reasonable objective. We think it does.

Here we may take note of the fact that Mrs. Cohen attempts to confine her attack to the rules under which the time of commencement of maternity leave is determined. There she likens pregnancy to illness and other physical disability, contending that failure to treat pregnancy as other disabilities is an unwarranted discrimination.[7]

We think our view should encompass the whole regulation.

There are obvious difficulties in the way of drawing a perfect analogy, as Mrs. Cohen would, between the several conditions contemplated by the maternity leave regulations and physical disabilities.

In the first place, the maternity leave policy of this school system covers an indefinite period of time, after delivery, when the young mother may wish to breast feed her baby or otherwise devote herself primarily to its care. A few weeks after a normal delivery, a healthy young mother is suffering no physical disability. If she chooses to remain on maternity leave for some months thereafter, she does so because of a temporary preference for child-care over a return to teaching and not because of anything remotely resembling illness or physical incapacity.

Even pregnancy is not like illnesses and other disabilities. In this age of wide use of effective contraceptives, pregnancy is usually voluntary. No one wishes to come down with mononucleosis or to break a leg, but a majority of young women do wish to become pregnant, though they seek to select the time for doing so. Female school teachers, like other young women, plan to become pregnant.[8]

Unlike most illnesses and other disabilities, too, pregnancy permits one to foresee its culmination in a period of confinement and to prepare for it. The employer of the pregnant woman need not wait until the clock has struck to search for a replacement. Unexpected illnesses and disabilities may compel resort to a pool of substitute teachers available for short periods of employment, but pregnancy assures an opportunity to secure a more permanent replacement. As planning precedes most pregnancies, planning for the arrangements they necessitate may go hand in hand with them.

5. 18 U.S.C. §§ 644, 656.

6. 15 U.S.C. §§ 78n, 78ff.

7. Her reasoning would seem to invalidate the provision for extended post-delivery leave during which the teacher-mother has a continuing guarantee of reemployment.

8. Of course, all pregnancies among teachers, as with other women, are not voluntary. *See* Love's Labor Lost: New Conceptions of Maternity Leave, 7 Harv.Civ. Rights—Civ. Liberties L.Rev. 260, 283–84, 288.

That circumstance supplies the justification for the rule that puts the starting of maternity leave, after the fifth month of pregnancy, within the control of school officials rather than in that of each pregnant teacher.[9]

Eighty per cent of the teachers employed in this school system are women. The system is large enough that the Board knows that a certain number of its teachers will become pregnant each year.[10] It knows that many of them will be unable to perform teaching duties over a period of several or many months, while some will be unwilling to do so for several months after the baby's delivery. The pregnant teacher's absence is not only predictable; it is of much longer duration than absences caused by such relatively transitory things as respiratory infections and digestive upsets.

Extended absences of teachers can occasion highly objectionable discontinuity in the education of children. When an extended absence is foreseen, the interest of the children is served by the employment of a regular replacement rather than dependence upon a succession of substitutes. That interest is furthered by the rule which starts the maternity leave at the end of the fifth month of pregnancy with the provision that the superintendent may postpone the time upon the teacher's request and with the approval of her doctor and her principal.[11] Placing ultimate control in school officials rather than in each individual teacher, affords an opportunity for useful planning and specific commitments to replacement teachers, who, otherwise, might not be available.

Mrs. Cohen, in her contract, agreed to abide by the regulations.[12] Her effort to avoid them insofar as she dislikes them in their application to her should not prevail, for the regulations are not without reason.[13] Their purpose may reasonably be regarded as contributing to the better education of the pupils by enabling school officials to arrange a larger degree of continuity in their instruction.[14]

Reversed.

WINTER, Circuit Judge (dissenting):

Because I disagree with the conclusion of the majority and because the majority's decision, if it prevails, may well be relied on to invalidate an aspect of the implementation of the Equal Employment Opportunity Act, Title VII of

9. Since we conclude that continuity in instruction reasonably supports the rule we need not consider other personalized reasons advanced in support of the regulation.

10. In addition to Mrs. Cohen, two others began maternity leave in December, 1970.

11. There is no built-in protection against arbitrary application of the rule in particular cases. If extension were denied when no replacement was available or within weeks of the end of the school year, a different case would be presented.

12. Concurring in Healy v. James, 408 U.S. 169, 202, 92 S.Ct. 2338, 2356, 33 L.Ed.2d 266, Mr. Justice Rehnquist wrote:
  "Cases such as United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and Pickering v. Board of Education etc., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), make it equally clear that the government in its capacity as employer also differs constitutionally from the government in its capacity as the sovereign executing criminal laws."

13. See, McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393.

14. The point is being widely litigated with diverse results. See, e. g., Schattman v. Texas Employment Commission, 5 Cir., 459 F.2d 32; LaFleur v. Cleveland Bd. of Educ., N.D.Ohio, 326 F.Supp. 1208; Doe v. Osteopathic Hospital of Wichita, D. Kansas, 333 F.Supp. 1357; Robinson v. Rand, D.Colo., 340 F.Supp. 37; Williams v. School District, N.D.Calif., 340 F. Supp. 438; Monell v. Dept. of Social Services, S.D.N.Y.; Danielson v. Bd. of Educ. of the City Univ. of N. Y., S.D. N.Y.; Bravo v. Bd. of Educ., N.D.Ill., 345 F.Supp. 155; Cerra v. East Stroudsburg Area School District, 3 Pa.Cmwlth. 665, 285 A.2d 206.

the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a),[1] I respectfully dissent.

The majority concludes that the regulation does not discriminate against women as such; it only discriminates between pregnant teachers and other teachers. "It [the regulation] does not apply to women in an area in which they compete with men." As to the pregnant school teacher, so the argument runs, the discrimination is permissible because of the need to provide continuity of education in the classroom.[2] Stated otherwise, a uniform date for the beginning of maternity leave is necessary to avoid disruption in the classroom by a sudden and unpredictable need to replace a teacher who delivers prematurely or who suffers a complication of pregnancy necessitating her absence from the classroom.

While superficially appealing, I am not persuaded by this argument and I think it a disingenuous one to be advanced on this record. The record is clear that there is not a high incidence of risk of premature delivery or complications of pregnancy in the beginning of the third trimester of pregnancy—the date that the regulation establishes as the beginning of maternity leave. And on the facts of this case, one can reasonably infer that continuity of the educational process would have been better preserved had Mrs. Cohen been permitted to complete the semester rather than to subject her students to a new teacher at an illogical and avoidable breaking point in the curriculum.

But there is a more fundamental defect in the majority's opinion. That the regulation is a discrimination based on sex, I think is self-evident. The inescapable truth is as Chief Judge Brown of the Fifth Circuit has stated, dissenting from denial of a motion for rehear-

---

1. In addition to seeking redress of an alleged denial of equal protection, plaintiff's complaint sought relief under the Equal Employment Opportunity Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a):

   It shall be an unlawful employment practice for an employer—
   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;
   . . . .

   At the time of the proceedings below, however, state agencies and educational institutions were specifically exempted from the Act. 42 U.S.C.A. § 2000e(b); 42 U.S.C.A. § 2000e–1. Subsequent to oral argument, these exemptions were repealed by the Equal Employment Opportunity Act of 1972, P.L. 92–261, signed by the President March 24, 1972 and effective immediately. On April 5, 1972, the Equal Employment Opportunity Commission adopted guidelines (a) declaring that exclusion of employees "from employment . . . because of pregnancy is in *prima facie* violation of Title VII" (29 C.F.R. § 1604.10(a), and (b) requiring employers to treat disabilities caused by pregnancy and childbirth like other temporary disabilities (29 C.F.R. § 1604.-10(b)).

   Although rules and practices of the defendant in effect when the defendant was exempt from the Act cannot be the basis for a violation of that Act, even though, as the *amicus* correctly points out, they are entitled to "great deference" in interpreting the Act, Griggs v. Duke Power Co., 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the majority's holding is to the effect that constitutionally discrimination between pregnant women and other women and men, on account of pregnancy, is permissible. It would seem to follow that a contrary regulation would be in excess of the statutory grant of authority.

2. The record belies the benevolent purpose of the school officials ascribed to them by the majority: The principal of Mrs. Cohen's school had previously requested that she be permitted to teach until the end of the first semester, January 21, 1971. From the standpoint of minimizing disruption of the education process of her students, this would seem to have been a sensible request. However, blind adherence to the regulation, or the board's convenience in providing a replacement, or possibly the replacement's convenience in beginning work, was permitted to prevail. The board itself never articulated the reason for rejecting the recommendation of one who could be expected to have more intimate and accurate knowledge of the needs of the pupils affected than it.

ing in banc in Phillips v. Martin-Marietta Corporation, 416 F.2d 1257, 1259 (5 Cir. 1969), a case in which an employer who was willing to hire men with pre-school-age children for a certain position but not women was held not to have violated Title VII of the Civil Rights Act of 1964:

> The distinguishing factor seems to be motherhood versus fatherhood. The question then arises: Is this sex-related? To the simple query the answer is just as simple: Nobody—and this includes Judges, Solomonic or life tenured—has yet seen a male mother. A mother, to oversimplify the simplest biology, must then be a woman.

Chief Judge Brown's analysis was echoed by Judge Wisdom, also in dissent in Schattman v. Texas Employment Commission, 459 F.2d 32, 42 (5 Cir. 1972), a case asserting the validity of a Texas regulation requiring a pregnant state employee to begin maternity leave not later than two months before her predicted delivery date: "Female employees are the only employees . . . who become pregnant; it follows that they are provisionally dismissed from work on account of their sex . . . ."

I need not concern myself with the applicable test to discriminate validly on the basis of sex—whether "rational relationship to a state objective," Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971); Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), or a compelling state interest, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L. Ed.2d 600 (1969)—because under either, I think the regulation denies equal protection. The record is literally devoid of any reason, medical or administrative, why a pregnant teacher must accept an enforced leave by the end of the fifth month of pregnancy if she and her doctor conclude that she can perform her duties beyond that date. Of course her employer is entitled to reasonable notice of when the teacher and her doctor conclude her leave should begin, so as to enable the employer to provide an adequate substitute, but it would seem that in most instances notice of not more than thirty days would be ample for that purpose. If I put aside instances where a teacher, male or female, suffers a sudden illness or the need for emergency surgery, and where presumably the teacher has little or no notice of impending prolonged absence, I cannot find in the record, nor can I imagine, any justification for requiring greater certainty as to the effective leave date of a pregnant teacher than of any other teacher, male or female, who may be absent for a prolonged period as a result of elective surgical procedure.

To give an example of my last statement, prostatitis is peculiarly a male disease and in this sense sex related. A prostatectomy which may be required as a result of prostatitis or other chronic disease of the prostate, is rarely performed as an emergency surgicial procedure. Rather, within a reasonable time range, the date for a prostatectomy is scheduled for a date suiting the availability of the hospital and the convenience of the surgeon and the patient. Under general sick leave regulations, a male teacher planning to undergo a prostatectomy is not required to give advance notice of the contemplated operation or to begin sick leave at any specific date, even at a semester break if one should intervene, prior to the operation, or to seek permission to continue work until the operation. Lest it be thought that an elective prostatectomy among male teachers is a rare event, I stress that the general sick leave requirements contain no requirement of notice, a mandatory beginning of sick leave or continuation of employment after notice until surgery for *any* elective surgery for *any* teacher, male or female. Yet it cannot be said that the disruptive effect on the students or the burden on the school administration is any less in the case of any elective surgery than the disruption and burden occasioned by a pregnant teacher's absenting herself to deliver. Indeed, it would be greater since the pregnant teacher would have been re-

quired to give notice of her impending confinement and thus school officials would have had ample time in which to find a replacement. To me, the discrimination is obvious.

I agree with the Sixth Circuit's decision in LaFleur v. Cleveland Board of Education, 465 F.2d 1184 (1972) holding invalid, as a denial of equal protection of the laws, a maternity leave regulation which, like that in the case at bar, required a teacher to begin maternity leave not later than five months before the expected date of normal birth of her child, but which, incidentally, required only two weeks notice of the fact of pregnancy and prohibitied the teacher's return to her duties earlier than three months after the child's birth. Both the enforced leave before and after birth were held impermissible, because there was lacking, as here, medical evidence or any other valid reason to support the extended period of mandatory leave. While the court recognized that continuity of classroom instruction and relief of burdensome administrative problems would both be served if the regulation were upheld, it concluded that these problems were no more acute with respect to pregnant teachers than other teachers, male or female, who suffered other actual disabilities; and moreover, that administrative convenience could not be permitted to override "the determinative issues of competence and care" (Stanley v. Illinois, 405 U.S. 645, 657, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972)). Rejected also was the argument that the teacher was bound by her employment contract which required adherence to the regulation because "constitutional protection does extend to the public servant whose exclusion . . . is patently arbitrary or discriminatory." Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952).

Additional support for my views is found in Robinson v. Rand, 340 F.Supp. 37 (D.Colo.1972); Doe v. Osteopathic Hospital of Wichita, 333 F.Supp. 1357 (D.Kan.1971); Williams v. School District (N.D.Cal.1972); Monell v. Dept. of Social Services (S.D.N.Y.1972); Bravo v. Board of Education, 345 F.Supp. 155 (N.D.Ill.1972); Heath v. Westerville Board of Education, 345 F.Supp. 501 (S.D.Ohio 1972). There is a contrary dictum in the split decision in Schattman v. Texas Employment Commission, supra, indicating that a maternity leave regulation requiring leave to begin not later than two months before the expected delivery date would be valid; but, without expressing any view on the correctness of the dictum, I agree with the Sixth Circuit in *LaFleur* that *Schattman* is distinguishable from the instant case on its facts.

CRAVEN and BUTZNER, JJ., authorize me to say that they join in this opinion.