Martha V. GILBERT et al.

v.

GENERAL ELECTRIC COMPANY.

Civ. A. No. 142–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 13, 1974.

See also 59 F.R.D. 267, 347 F.Supp. 1058.

Seymour Dubow, Richmond, Va., Ruth Weyand, Associate Gen. Counsel, International Union of Electrical, Radio and Machine Workers, AFL–CIO and CLC, Washington, D. C., for plaintiffs.

· John S. Battle, Jr., Robert H. Patterson, Jr., McGuire, Woods & Battle, Richmond, Va., Stanley R. Straus, Vedder,

Price, Kaufman & Kammholz, Washington, D. C., for defendant.

Samuel W. Hixon, III, Williams, Mullen & Christian, Richmond, Va., for amicus curiae, The Chamber of Commerce of the U. S..

Burt A. Braverman, Washington, D. C., for U. S. C. C.

Linda Colvard Dorian, Washington, D. C., for EEOC.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff female employees of defendant General Electric Company (G.E.), which is an employer within the meaning of the appropriate section of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e(b), seek class relief from alleged sex employment discrimination practices by that company in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Plaintiff, International Union of Electrical Radio and Machine Workers, AFL–CIO–CLC, is the recognized bargaining representative of a national collective bargaining unit composed of employees of defendant at plants throughout the United States. Included in said unit at various plants are a number of the named plaintiffs. Plaintiff, Local 161, is an affiliate of the International, concerned primarily with defendant's Salem, Virginia plant. Other groups or units of employees at defendant's plants and locations have designated other labor organizations, not parties hereto, as their exclusive representatives.

G.E., however, pursued a policy of negotiating a uniform health insurance benefits contract which applies equally to all unionized and non-unionized employees. The bargaining is conducted on behalf of the participating unions by a steering committee which includes plaintiff union. Representations which are uncontradicted were made to the Court that all but 50 unionized employees are represented in the health plan negotiations by the plaintiff International (IUE) or some other member of the steering committee. The steering committee unanimously adopted a proposal under date of January 15, 1973, which promulgates the position espoused by the plaintiff union, hence the Court found it unnecessary to order joinder of the nonparty unions. See Memorandum of May 16, 1973.

Jurisdiction is invoked pursuant to 42 U.S.C. § 2000e–5(f)(3). The employment practice complained of is G.E.'s denial of sickness and disability benefits to employees absent because of pregnancy.

The numerous · pleadings, voluminous records and endless motions belie the underlying simplicity with which the issues herein may be stated. For these purposes it suffices to note that prior to hearing of this matter, the bulk of this litigation has been concerned with procedural questions of an often difficult nature, including venue, see D.C., 347 F. Supp. 1058 (Sept. 25, 1972); compliance with EEOC procedures, see memorandum of February 2, 1973; class determination and counter-claim, see D.C., 59 F. R.D. 267 (April 30, 1973); and compulsory joinder, see memorandum of May 16, 1973, *supra.*

Once having traversed the thicket of procedural complexities, the issues presented are not difficult. Briefly stated, G.E. provides weekly non-occupational sickness and accident benefit payments (hereinafter "S & A") to all its employees in an amount equal to 60 percent of an employee's straight time weekly wage up to a maximum benefit of $150 per week for each week the employee is absent from and unable to work on account of any disability resulting from a non-occupational accident or sickness for a period up to and including 26 weeks for any one continuous period of disability or successive periods of disability due to the same or related cause. Said coverage applies with one exception: sickness or other disabilities aris-

ing from pregnancy, miscarriage or childbirth are not included.[1]

Each of the original named plaintiffs was a G.E. employee who became pregnant during 1971. Each made claims for S & A benefits and was denied same. Several of the plaintiffs filed charges with the Equal Employment Opportunities Commission and, upon waiting the requisite period, brought this suit with their local and national unions, which are co-plaintiffs. Pursuant to the Court's order of April 30, 1973, the original named personal plaintiffs were declared representatives of two classes:

I. With respect to declaratory relief concerning the issue of whether G.E.'s refusal to pay S & A benefits to pregnancy related cases is violative of law, said named plaintiffs represent a class of all females who are now or have been employed by G.E. on or after September 14, 1971, or who become so employed during the pendency of this action and also all female employees who became pregnant and were denied S & A benefits or will be denied S & A benefits therefor from September 14, 1971. This class numbers approximately 100,000 women at hundreds of G.E. plant locations nationally.

II. With respect to damages for those women actually denied benefits from September 14, 1971, the named plaintiffs represent all such women in this sub-class. The number of women in this class is uncertain at this stage, although during 1971 G.E. received over 5,500 claims for S & A benefits from women absent because of pregnancy. [Interrogatory #36]. Pursuant to the Court's order of May 14, 1973, members of both the class and sub-class were given notice of the pendency of this action.

FRCP 23(c)(2). No request for exclusion as a class member was received by the Court.

The gravamen of plaintiffs' legal claim is that the challenged S & A policy is violative of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and EEOC guidelines issued thereunder by virtue of constituting illegal sex discrimination.[2] In support of this claim, plaintiffs assert factually that there is no medical, economic or sociological basis for distinguishing pregnancy disabilities from other types of disabilities covered by G.E.'s S & A program. Defendants, in brief, argue that pregnancy may be distinguished on several accounts and that said distinctions justify G.E.'s S & A policy under Title VII.

## I. Stipulated Facts

Counsel have entered into a lengthy stipulation of facts which, in pertinent part, reads as follows:

. . . . . .

1. The plaintiff International Union of Electrical, Radio and Machine Workers (AFL–CIO) hereinafter called International Union, and the defendant General Electric Company, hereinafter called GE, on February 4, 1971, entered into a 1970 Settlement Agreement, a copy of which is attached hereto marked as Exhibit A, which by its terms was effective until May 26, 1973.

2. Part Three of said 1970 Settlement Agreement is the 1970–1973 GE–IUE National Agreement, a copy of which is attached hereto marked Exhibit B. The foregoing 1970 Settlement Agreement has been recognized by International Union and GE as applicable to all the plants and classifications listed on pages

---

1. Though not raised by the complaint, plaintiffs also challenge defendant's long term disability programs which exclude maternity benefits as well. The legal and factual issues being identical, the Court will deal primarily with the sickness and accident coverage, except where otherwise noted.

2. Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2(a): "It shall

be unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; . . . .

1 to 5, inclusive of the 1970–1973 GE–IUE (AFL–CIO) National Agreement, and also to certain additional plants and classifications for which the International Union has been certified subsequent to February 4, 1970.

3. At all times since January 26, 1970, pursuant to the 1970 Settlement Agreement and particularly to the provisions of the 1970 GE–IUE Pension and Insurance ·Agreement, GE has provided and does now provide non-occupational sickness and accident benefit payments to all of its employees represented by the plaintiff International Union and its affiliated IUE locals in an amount equal to 60 percent of an employee's normal straight time weekly earnings up to a maximum benefit of $150 for each week he or she is totally disabled as a result of a non-occupational accident or sickness for a period up to and including 26 weeks for any one continuous period of disability or successive periods of disability due to the same or related cause, excepting therefrom absences due to pregnancy or resulting childbirth or to complications in connection therewith. The full terms and conditions governing the payment by defendant GE to such employees of weekly non-occupational sickness and accident benefits and medical expense benefits at all times since January 26, 1970, are set forth in the General Electric Insurance Plan with comprehensive Medical Expense Benefits, as amended January 26, 1970 (ERB–32D) a copy of which is attached hereto as Exhibit C.

.    .    .    .    .    .

5. At all times since January 1, 1970, pursuant to the 1970 Settlement Agreement, GE has maintained for hourly employees represented by the plaintiff International Union and its affiliated IUE locals the General Electric Long Term Disability Insurance Plan for Hourly Employees effective January 1, 1970 (ERB–135), a copy of which is attached hereto as Exhibit E.

6. At all times since January 1, 1970, pursuant to the 1970 Settlement Agreement, GE has maintained for salaried employees represented by the plaintiff International Union and its affiliated IUE local unions the General· Electric Long Term Disability Income Plan for Salaried Employees, as amended January 1, 1970, a copy of which is attached hereto as Exhibit F.

7. At all times since January 26, 1970, pursuant to the 1970 Settlement Agreement, GE has maintained for the employees represented by the plaintiff International Union and its affiliated locals the General Electric Pension Plan, as amended January 1, 1970 (ERB–42E), a copy of which is attached hereto as Exhibit G.

8. At all times since January 1, 1970, GE has maintained for pensioners who retired from employment in which they were represented by plaintiff International Union and its affiliated IUE locals, the medical care plan for pensioners which is set forth in the aforesaid 1970 GE Insurance Plan with Combined Medical Expense Benefits (ERB–32D) . . . copy of a booklet entitled "General Electric Medical Care Plan for Pensioners" (ERB–107C), in which there is reproduced the medical care plan for pensioners set forth in such General Electric Insurance Plan.

9. At all times since January 1, 1971, pursuant to the 1970 Settlement Agreement, GE has maintained for all employees represented by the plaintiff International Union and its affiliated IUE locals the Individual Development Program, effective January 1, 1971 (ERB–161), a copy of which is attached hereto marked as Exhibit I.

10. The General Electric Insurance Plan with Comprehensive Medical Expense Benefits as amended July 26, 1970 (ERB–32D), a copy of which is attached hereto as Exhibit C, is made applicable to GE employees who are not represented by the plaintiff International Union and its affiliated IUE locals. As to those GE employees represented by unions other than plaintiff International Union and its affiliated IUE locals, the

Plan is made applicable pursuant to collective bargaining agreements between GE' and such unions.

11. At all times since October 3, 1966, and at the present time GE has been and is primarily responsible for the payment to its employees of the weekly sickness and accident benefits specified in the General Electric Insurance Plan then and now operative and was and is in effect a self-insurer. With respect to coverage outside of California during this period, GE has obtained an insurance policy covering weekly sickness and accident benefits, among others, whereunder a tentative initial premium was paid to Metropolitan Life Insurance Company (hereinafter "Metropolitan Life") subject to later adjustment in the light of actual experience. In California GE has made no arrangements with any insurance carrier with respect to its weekly sickness and accident undertaking under the Insurance Plan. With respect to weekly sickness and accident coverage under the Insurance Plan for employees in California, GE was and is a self-insurer in form and in effect.

12. The plaintiff International Union as one of its proposals during national bargaining negotiations with defendant GE in 1955, 1963, 1966 and 1969 requested the deletion of the language then present and still present in the General Electric Insurance Plan, at p. 18 of Exhibit C attached hereto, which then provided and still provides that benefits under the Weekly Sickness and Accident Insurance Plan will not be payable for any absence due to pregnancy or resulting childbirth or to complications in connection therewith. During each of said negotiations the plaintiff International Union requested the defendant GE to pay weekly sickness and accident benefits for a maximum of six weeks for absences due to pregnancy or resulting childbirth but defendant GE refused to agree to make any payment of weekly sickness and accident benefits for absences due to pregnancy or childbirth. Exhibit H–2 attached hereto is a correct copy of the proposals for changes in the General Electric Insurance Plan which the plaintiff International Union presented to defendant GE on August 26, 1969.

.    .    .    .    .    .

23. The Employee & Community Relations Instructions bearing the issue date 2/1/68, Instructions No. ER–2.31 and ER–2.32, copies of which are attached hereto marked Exhibit U–1 and U–2, were issued to management personnel by defendant GE at its Salem, Virginia plant on the date indicated. The Employee Handbook, GE, Industrial Control Department, Salem, Virginia, attached hereto marked Exhibit U–3 was mailed to all non-supervisory employees of the Salem plant in May or June 1970 and was distributed to all new non-supervisory employees hired during the rest of 1970 and 1971 during the orientation sessions conducted by the defendant GE for new employees. Copies of said Employee Handbook were distributed to all new nonsupervisory employees until the supply of the handbooks was exhausted. No record is available as to the exact date on which the supply was exhausted but it is believed to have been exhausted towards the end of 1971. No new handbook has been distributed to non-supervisory employees at any time since 1970. At no time since 1968 has the defendant GE issued any written notice or written instructions to non-supervisory employees at the Salem plant that the policy respecting mandatory leave stated in such Employee Handbook is no longer in effect.

.    .    .    .    .    .

25. The defendant GE at its Salem, Virginia plant at all times here material has followed the practice and at the present time does follow the practice of notifying each female who is about to go on leave for purposes of childbirth that she is to phone the plant six weeks after her child is born.

.    .    .    .    .    .

28. Except as to plaintiff Doris Wiley, the defendant GE paid hospital bills for

the childbirth or miscarriage of each of the individually named plaintiffs. As to those individually named plaintiffs represented by the plaintiff International and its affiliated IUE locals, such payments were made pursuant to the 1970 GE–IUE Pension and Insurance Agreement.

29. Exhibits PP, QQ, RR, SS, TT, UU, VV, and WW are true copies of the claims filed with the defendant GE by the plaintiffs Barbara S. Hall, Doris B. Wiley, Sharon E. Godfrey, Alberta B. Smith, Mary R. Williams, Johnnie E. Taylor, Martha V. Gilbert and Erma F. Thomas, respectively. The other employees listed below each filed a claim with the defendant GE for non-occupational sickness and accident benefits for all the period she was on pregnancy leave as shown in paragraph 41 herein, upon the form of claim supplied by GE, which was certified and signed by her personal physician and in which the question if the disability was caused by pregnancy was checked "yes" by her physician. Each of said claims was respectively denied by the defendant GE on the date listed opposite the employee's name. The sole ground stated for the denial in all cases was that the General Electric Insurance Plan provides that benefits under weekly sickness and accident insurance will not be payable for any absence due to pregnancy, resulting childbirth or to complications in connection therewith. In those instances in which the employees also processed a grievance to the Third Step, the National Docket Number of the grievance is stated and where a Third Step answer denying the grievance has been received the date of such denial is as stated.

. . . . . .

30. The plaintiff Brenda Christian applied to defendant GE at its Fort Wayne plant on July 17, 1972, for a form on which to apply for weekly sickness and accident benefits but defendant GE refused to give her a form. On July 19, 1972, Bob Wire, Business Agent of Local 901, IUE wrote a letter to H. K. Reinking, Manager, Personnel Accounting and Banking, GE, Fort Wayne, complaining of the refusal of defendant GE to furnish the plaintiff Brenda Christian with a form, a copy of which letter is attached hereto marked Exhibit EE. Under Date of July 21, 1972, M. E. Hamilton, Manager Union Relations, GE, Fort Wayne, wrote the said Bob Wire a reply, a copy of which is attached hereto marked FF.

31. The plaintiff Emma Furch is employed at the Tyler, Texas plant of the defendant GE and has a seniority date of October 13, 1966. On April 5, 1972, she went on pregnancy leave and was hospitalized on April 7, 1972. On April 14, 1972, she delivered a stillborn baby. After returning home she was again hospitalized on April 21, 1972, due to a blood clot in the lung unrelated to her pregnancy or miscarriage. The plaintiff Emma M. Furch filed a claim with the defendant GE for weekly sickness and accident benefits, a copy of which is attached hereto as Exhibit XX. Her claim was returned attached to a letter dated June 6, 1972, signed by S. J. Przywara, a copy of which is attached hereto as Exhibit YY.

32. The defendant GE at all times here material has paid and is paying weekly sickness and accident benefits on the basis of each calendar day so that each day of entitlement is paid at the rate of $\frac{1}{7}$ of the weekly rate. The defendant GE at all times here material has and is now using calendar days in determining the 8th day on which the benefits start when an employee is disabled for eight days without being confined in a hospital during these days.

33. The defendant GE has an established and uniform policy of paying weekly sickness and accident benefits to each employee on account of a qualifying sickness and accident for such period as the employee is authorized to be

absent and for such extended period or periods as are certified by the employee's personal physician, except where the defendant GE by its own physician disputes the existence of a disability, limited, however, by the maximum period of 26 weeks for any one disability or sickness. On many occasions an employee who had received such payments for 26 weeks thereafter failed to return to work, either because of death, continuing disability, retirement, or, in relatively few cases, because of quitting. In the relatively few quitting cases where an employee does not return to work after receiving sickness and accident benefits, only where defendant GE has contended the amounts were fraudulently obtained, has the defendant GE attempted to recover any amounts so paid.

34. The claim for Weekly Sickness and Accident Benefits filed by the plaintiff Martha V. Gilbert was denied by a letter to J. O. Randall, Supervisor, General Electric Company, from N. E. Sarmiento, Assistant Supervisor, Group Health Claims, Metropolitan Life, dated December 17, 1971, a copy of which is attached hereto marked Exhibit GG. Copies of said letter were furnished to plaintiff Martha V. Gilbert and to plaintiff Local 161 on or about December 18, 1971. The claims of plaintiffs Alberta B. Smith, Johnnie Taylor and Doris B. Wiley for Weekly Sickness and Accident Benefits were each denied by a letter to J. O. Randall, Supervisor, General Electric Company from N. E. Sarmiento, Assistant Supervisor, Group Health Claims, Metropolitan Life, dated November 1, 1971, all of which were substantially similar with the aforesaid letter to plaintiff Martha V. Gilbert except for the name of the claimant. The claim of the plaintiff Barbara Hall for Weekly Sickness and Accident Benefits was denied by a letter to J. O. Randall, Supervisor, Group Health Claims, Metropolitan Life, dated November 1, 1971, a copy of which is attached hereto marked Exhibit HH. Copies of said letter were furnished to the plaintiff Barbara Hall and to plaintiff Local 161 on or about November 2, 1971.

35. The plaintiffs Martha V. Gilbert, Sharon E. Godfrey and Doris B. Wiley each filed a grievance challenging the denial of her claim for Weekly Sickness and Accident Benefits for the period she was disabled by pregnancy. In each instance the grievance was denied at the first and second step of the grievance machinery. The answer of the defendant GE at the first step of the grievance machinery was in each instance in the form of a statement written by a supervisor of GE on the bottom of the grievance form. The plaintiff Sharon E. Godfrey filed her grievance on December 8, 1971, and the answer written thereon by her supervisor stated:

"In accordance with the IUE–GE Pension and Insurance Agreement and page 18 of the Insurance Pension Booklet (ERB–32D) Weekly Disability Benefits are not payable for absence due to pregnancy or childbirth."

A copy of the grievance filed by the plaintiff Sharon E. Godfrey bearing thereon the denial by the defendant GE at the first step, is attached hereto marked Exhibit JJ. The grievances filed by the plaintiffs Martha V. Gilbert, Barbara Hall, Alberta B. Smith and Doris B. Wiley were each answered by the defendant GE at the first and second step in substantially the same words.

36. The grievances filed by the plaintiffs Sharon E. Godfrey, Barbara Hall, Alberta B. Smith and Doris B. Wiley were all sent to New York City for processing there at the third step in the grievance procedure in accordance with provisions of the IUE–GE National Agreement. These grievances were all presented to the defendant GE at the third step of the grievance procedure on May 25, 1972, and were all denied by the defendant GE by notification to the plaintiff IUE, entitled "Company Posi-

tion, Roanoke, Virginia, L–161, meeting date May 25, 1972, New York," signed by B. Hindle, dated June 8, 1972, a copy of which is attached hereto marked Exhibit KK. The ground stated for the denial is as follows:

> "It is the Company position that the denial of sickness and accident benefits during .a leave of absence for pregnancy is consistent with the terms of the Agreement negotiated between the Company and the Union and to which the Union is therefore a party."

37. In the instance of all claims filed by the individually named plaintiffs for weekly sickness and accident benefits and in the instances of all grievances filed by the individually named plaintiffs grieving the denial of their claims the defendant GE has never contested or admitted the fact that the grievant was disabled from work by pregnancy or childbirth, but has denied the claim and justified its rejection of the claim for Weekly Sickness and Accident Benefits solely on the ground that such benefits were not properly due when the absence was caused by pregnancy or childbirth.

38. The defendant GE has paid sickness and accident benefits for periods during which employees, whether male or female, are totally disabled because of

(a) sclerosis of the liver

(b) lung cancer

(c) emphysema

(d) injury incurred in auto accident

(e) injury incurred in sport activity of employee

(f) injury incurred in a fight

Also defendant GE has paid sickness and accident benefits for periods during which employees, whether male or female, are totally disabled because of the following causes (the number of total claims based on disabilities resulting from such causes is infinitesimal and claims for such disabilities rarely occur):

(g) following a program for the cure of alcoholism

(h) injury incurred in an attempted suicide

(i) drug addiction

(j) following a program for the cure of drug addiction

(k) sterilization

(l) elective surgical operations unrelated to pregnancy

(m) elective plastic surgery

(n) following a program of psychiatric treatment

39. The defendant GE has on occasion temporarily assigned to other suitable work an employee who is disabled temporarily from performing his or her regular job but is not disabled from performing other available work.

.   .   .   .   .   .

41. Each of the employees whose name is listed below has the seniority date stated following her name, and except for plaintiff Furch was absent for pregnancy, miscarriage or childbirth from the date stated in the column headed Date Went On Pregnancy Leave until the date listed in the column headed Date Returned To Work, at the time of leaving work to go on pregnancy leave had the straight time weekly earnings stated and gave birth to a baby or miscarried on the date indicated: . . . .

42. During August 1971 Robert Friedman, Assistant General Counsel of the plaintiff International Union, telephoned E. S. Willis, the Manager of Employee Benefits at the national level for the defendant GE, during said telephone conversation Robert Friedman called the attention of E. S. Willis to EEOC Decision No. 71–1474, CCH–EECC Decision Para. 6221, issued March 19, 1971.

Other stipulations entered into with respect to GE's statistical experience with maternity leaves will be included *infra*.

## II. Findings of Fact

### A. Medical Questions.

Much evidence has been adduced addressed to the question of the voluntariness of pregnancy. That issue is raised by virtue of G.E.'s assertion that the alleged voluntariness of pregnancy justifies, under Title VII, the treatment of that condition in the manner challenged. (See Conclusions of Law, *infra* for discussion of legal issues).

Dr. Hellegers, an expert called by plaintiffs, stated that although specific methods of contraception present difficulties,[3] that nevertheless medically the majority of conceptions are planned or accepted. As Dr. Hellegers noted, the number of annual pregnancies, about 4.2 million[4] (about 1 million of which are terminated by abortions) is relatively low when compared to the number of women capable of bearing children. Statistics submitted by the defendants, DX 42, show that for women between the ages of 17 and 42, the total female population is approximately 74.5 million and annual births approximate 3.7 million; for working women, of a total population of 18.5 million there are 1.6 million births.[5] (DX 42). An inference to be drawn from these statistics is that many women are able to prevent pregnancy, indicating that the condition of pregnancy may to a large degree be controlled. Yet ultimately, these figures show only that most women, through one means or another, are successful in avoiding pregnancy. While this might constitute circumstantial evidence as to the intent of those who do become pregnant, it is at best attenuated. Current conduct is not always indicative of long range intent. Neither negligence nor accident are foreign to human and legal experience. As stated above, the evidence is that one quarter of pregnancies are aborted.

At best, what these figures show is that with proper care, forbearance, and precaution, pregnancy can to a large extent be avoided. But "voluntariness" in this sense is meaningless. This standard is not applied to informal athletic injuries, most of which could also be avoided by appropriate preparation, forbearance and circumspect precaution. The most that can be said with certainty is that some pregnancies, perhaps a majority, are voluntary; others are not.[6]

The great mass of expert testimony presented here on the subject merely confirms what appears obvious to any layman: pregnancy is not a disease, as that term is commonly understood; it is, however, at times, physically disabling, and the Court so finds. These broad findings, however, are susceptible to detailed qualification, highly germane to the issues presented here. While the Court finds that all the medical testimony is essentially in accord, the testimony of Dr. Hellegers is especially enlightening.

The term "disease" is, according to Dr. Hellegers, subject to varied definitions, depending on the approach used. Four definitions so offered may be summarized as follows:

1) Disease may be defined as a statistical deviation from the average. The difficulty with this definition lies in defining what is "average" or "normal."

2) Disease may be defined in terms of difficulty in ability to function. The weakness in this definition is defining "function" in a non-relative social or medical sense.

---

3. Oral contraceptives have a failure rate of 1%, which means one pregnancy will result from each 100 years exposure use; interuterine devices have a 2–7% failure rate; diaphragms present a 2–40% failure rate, depending on economic strata. Though approximately 1 million abortions per year are performed, they are not always advisable.

4. Defendants have offered a somewhat higher figure for births, 3.6 million, for women between the ages of 17 and 47 (DX42).

5. See Appendix "A".

6. The failure to abort cannot, in the Court's opinion, be considered a necessary indication of prior intent to conceive.

3) Disease may be defined as a condition, which if not corrected, may lead to disability or death. In this connection the medical term "morbidity" is applied, said term meaning a process of deterioration leading to death.

4) The World Health Organization (WHO) defines health as total physical, psychological and social well-being. By inference, disease is the converse, or lack of these factors.

Pregnancy, *per se*, does not come within the meaning of any of these, with the possible exception, for stated periods of time, of 1 and 2. Nevertheless, certain conditions incident to pregnancy come within the meaning of "disease." These conditions are commonly referred to as "complications" and many are disabling.

First, approximately ten percent of pregnant women will miscarry, the great majority of these during the first trimester of pregnancy. A miscarriage is physically disabling, although in most cases only for a few days.

Second, of the remaining complications which occur in about 10% of pregnancies, there are two general types. The first type includes those complications which are brought on by weight gain. They may be found in any person who suffers from underlying diseases which become more serious as a result of obesity. Examples of this category are hypertension and diabetes. For example, a person who has underlying diabetes may not normally be affected or disabled by same but upon gaining a large amount of weight in a short time experiences thereafter disabling symptoms. Pregnancy involves this sort of rapid weight gain, but the complications of this type suffered by a pregnant woman are of the same nature as she would suffer had she gained the same amount of weight in the same period and were not pregnant. Irrespective of the cause, treatment is essentially the same for pregnant and nonpregnant persons. In nonpregnant people these disabilities are termed diseases; for the reasons set forth they may properly be termed diseases in pregnant people as well. These diseases comprise approximately half of the complications.

The remaining complications are solely related to the physiology of pregnancy, dealing with problems of the placenta, uterus, etc. Two common examples are detachment of the placenta and mislocation of the placenta. Special procedures used only for pregnant women are employed in treatment. The aforesaid category may be described as pregnancy-related disease.[7] All these complications may prove disabling; about half actually require hospitalization.

Where complications are absent, which occurs in 90% of pregnancies that do not miscarry, the actual period of disability under normal conditions is short. A pregnant woman becomes progressively more disabled in the limited situations where girth is of importance. As Dr. Hellegers noted, for example, a woman pilot may have increasing difficulty through pregnancy in fitting between the pilot's seat and the control wheel of an airplane. There is, however, no evidence before the Court as to certain job requirements at G.E. which involve potential problems because of girth, and the parties have stipulated that job reassignments are made to accommodate disabilities. (St. p. 39).

Absent complications, there is no medical reason for not allowing a woman to work to the day before delivery or for limiting her activities prior to delivery. See deposition of Dr. Wilbanks, defendant's expert, at p. 8. There is no controversy as to this general medical principle.

Similarly, all experts agree that labor and delivery are disabling. The medical rule of thumb is that six weeks are required for recuperation from delivery. That figure is standardly used because healing should be at a certain medically

---

7. Other diseases as toxemia, edema and others are of unknown origin. Dr. Hellegers speculated that they may come from hormonal problems associated with weight gain.

One other disease which may be technically pregnancy-related is ectopic pregnancy. Once diagnosed, ectopic pregnancy requires immediate surgery.

definable stage by that time. A physician with a large practice thus would instruct his or her patients to return at the six week date for examination; if healing 'has not by that time conformed to the medical norm, corrective treatment is often required. While the recuperative process may be completed within two or three weeks, it is usually more practical to require a woman to return after six weeks than to have her examined numerous times from the third week on to determine when healing has progressed. Numerous visits may be common, however, when a physician deems it important for a woman to return to work as quickly as possible for psychological or economic reasons. Interestingly, the evidence discloses that housewives who perform daily household chores may find themselves back at the rigorous demands of family raising within a week or so.

In summary, the Court makes the following specific findings:

1. While pregnancy is perhaps most often voluntary, a substantial incidence of negligent or accidental conception also occurs.

2. Pregnancy, *per se*, is not a disease.

3. A pregnancy without complications is normally disabling for a period of six to eight weeks, which time includes the period from labor and delivery, or slightly before, through several weeks of recuperation.

4. Ten percent of pregnancies are terminated by miscarriage, which is disabling.

5. Five percent of pregnancies are complicated by diseases which are found in nonpregnant persons but which may have been stimulated by pregnancy. Five percent of pregnancies are complicated by pregnancy-related diseases. These complications are diseases which may lead to disability.

### B. The G.E. Experience

Much of the evidence before the Court concerns projected costs for maternity coverage under S & A. Included in same is a statistical analysis of G.E.'s past experience with its S & A plan and maternity leaves.

Counsel have entered into stipulations in this regard, which stipulations, dated July 24, 1973, read in part as follows:

143. During 1970, GE's experience, by sex, with respect to claims under its weekly sickness and accident disability insurance coverage was as follows:

| | Male | Female |
|---|---|---|
| No. of claims (new) | 19,045 | 15,509 |
| Average duration of claim | 48 days | 52 days |
| No. of new claims per thousand employees | 77 | 173 |
| Average No. of employees covered | 246,492 | 89,705 |
| Total benefits paid | $11,279,110 | $7,405,790 |
| Average cost per insured employee of total benefits paid | $45.76 | $82.57 |

144. During 1971, GE's experience, by sex, with respect to claims under its weekly sickness and accident disability insurance coverage was as follows:

| | Male | Female |
|---|---|---|
| No. of claims (new) | 22,987 | 17,719 |
| Average duration of claim | 47 days | 52 days |
| No. of new claims per thousand employees | 99 | 217 |
| Average No. of employees covered | 231,026 | 81,469 |
| Total benefits paid | $14,343,000 | $9,191,195 |
| Average cost per insured employee of total benefits paid | $62.08 | $112.91 |

145. [GE statistics with respect to pregnancy-related absences. See Appendix B]

146. [GE statistics with respect to absences for ectopic pregnancies. See Appendix C]

147. [GE statistics with regard to absences for abortions and miscarriages. See Appendix D]

148. . . .

149. S & A benefits for pregnancy absences during the period approximately 1939–1948 were paid only to employees in certain GE plants. Records relating to coverage in those years are incomplete, but it is believed that the following plants were covered by those provisions:
[List of 17 plants omitted]

During that period of time there was no company-wide GE group disability insurance plan and different company components were privileged to adopt insurance coverage as desired.

Upon trial, G.E. introduced the testimony of Paul Jackson, an actuary. Based upon the aforecited statistics and other data, Mr. Jackson calculated that

G.E.'s S & A plan costs 170% more for females than males and he projected that maternity coverage would yield a 300–330% greater cost. These projections were based upon an average maternity leave duration of 13 weeks. The Court notes, however, that prior to late 1971 G.E. had a mandatory six month rule requiring pregnant employees to leave after the sixth month of pregnancy, at its Salem, Virginia plant. The evidence before the Court indicates that said policy was also national. See, *e. g.*, PX51. No indication was given as to what extent the six month rule affected these statistics. Based upon the 13 week average, Mr. Jackson estimated that nationwide S & A maternity benefits for all women working in the national labor force and covered by S & A insurance would be $804 million. (DX42). Addition of maternity benefits to long term disability plans as well would cost an additional $1.35 billion, according to Mr. Jackson.

Mr. Jackson further testified that an inherent difficulty in writing S & A insurance generally is that, contrary to actuarial principles, the condition which gives rise to the insurance claim may not be beyond the control of the insured. Under S & A programs such as G.E.'s, where benefits are paid for sickness leaves whether voluntary or not, costs tend to be high because of voluntary elements. Within this context, Mr. Jackson asserted that pregnancy leaves, which may be voluntary both in respect to the fact and duration of absence, cause insufferable actuarial problems.[8] Although under the terms of G.E.'s S & A plan a doctor's certificate is required to prove medical disability, Mr. Jackson stated that doctors might be willing to give said certificates to women who wish to malinger. Accordingly, he urged that claim abuse might be high. The medical evidence before the Court, however, is that pregnant women would not, *per se*, be inclined to malinger more than other persons and, indeed, might have more difficulty in sustaining a fabricated complaint by virtue of the ease of examination by a doctor of the usual pregnancy related complaints.

Mr. Jackson also testified that about 50% of women who leave work for reasons of pregnancy do not return, although at G.E. the figure is lower, about 40%, according to other testimony of G. E. officials. In this regard, the Court notes that G.E.'s policy is to terminate a woman who does not return to work within eight weeks after delivery unless she asks for an extension of time. Interrogatory No. 67.

The thrust of this evidence is that S & A pregnancy benefits will inordinately increase the costs of the S & A plan. While the Court for the reasons heretofore stated has doubts about the exact figures projected and about some of the statistical assumptions,[9] it does find that maternity S & A benefits will increase G.E.'s S & A costs by an amount which, though large, is at this time undeterminable.

It is because of these increased costs that G.E. has refused to grant maternity benefits. This is readily apparent from the reasons for G.E.'s policy as outlined by Mr. Thomas Hilbert, G.E.'s Labor Relations Counsel. Those reasons may be summarized as follows:

1. The plan covers disabilities from sickness and accidents, of which pregnancy is neither.

8. GE pays S & A benefits for other voluntary sickness absences, see stipulated findings of fact, but according to Mr. Thomas Hilbert, GE's Labor Relations Counsel, these cases are minimal.

9. Evidence presented by Katherine East, Secretary to the presidential Citizen's Advisory Council on the Status of Women, suggests that S & A maternity costs may not be significantly more costly. See PX81, 121, cost estimates of the Aetna Insurance and Casualty Co. Also, according to Mrs. East, several companies, including Xerox, IBM and others, provide maternity benefits of varying types, but cost figures for same are not yet available.

2. The plan follows standard insurance practice, which still excludes pregnancy benefits.

3. Inclusion of pregnancy benefits in S & A is not a rational use of money, particularly as said inclusion may increase pregnancies and may be subject to claim abuse.

4. Pregnancy is completely voluntary.

5. Women utilize S & A more frequently than men under the present program and inclusion of pregnancy benefits would increase this unbalance.

6. Forty percent of G.E.'s women employees who take maternity leave do not return. Accordingly, S & A maternity benefits would in a great number of cases be the equivalent of giving women termination pay benefits not available to nonpregnant employees.

7. If women received S & A pregnancy benefits, men would demand benefits for absence taken for child care.

Several of the aforementioned assertions are factually erroneous. For example, under the S & A plan men could not demand child care absence benefits without proving their work absence resulted from medical disability. The termination pay problem exists with *all* workers who do not return to work following sickness or accident. All the reasons proffered have to do with dollars and cents.

## C. Socio-Economic Factors

Both sides have introduced numerous studies and testimony of a socio-economic nature. For example, Katherine East, Secretary to the Citizens' Council on the Status of Women, a presidentially appointed study group, testified that the

Council determined that policies of the sort challenged here are discriminatory. G.E. asserts in a similar vein that provision of S & A benefits for pregnancy will encourage births, and that said encouragement is contrary to a national policy of limited population growth.[10] Much of this testimony is self-serving, conclusory or irrelevant.

The question before the Court is a narrow one of statutory interpretation and the Court gives no weight, except as specifically noted, to these broad social concerns, which are more appropriate for legislative consideration.

Some of the statistical studies introduced, however, contradict or supplement G.E.'s cost projection analysis. While the Court, for reasons previously stated, finds the various cost statistics to be of too speculative a nature to be probative of actual future costs, the general trends and weight of those figures is relevant. For purposes of the record, the Court has included in appendices E, F and G certain statistics relevant to these matters.

## D. Good Faith

G.E. has sought to prove that its present legal position on the S & A maternity benefits question was arrived at by virtue of good faith reliance on EEOC pronouncements. While the legal efficacy of this argument will be considered *infra*, the Court's findings of fact with respect to same follow.

The Court notes that one of the early points of controversy in this litigation was the posture of the union in pressing for the change in maternity policy and the exact relationship of nonparty unions to contract negotiations. G.E. had initially sought to counterclaim against

---

10. In this respect, Mr. Hilbert, G.E.'s Labor Relations Council, introduced the results of a highly amusing, and dated, G.E. experiment in public relations. Exactly nine months prior to G.E.'s 75th Anniversary on October 15, 1953, the company announced that it would give five shares of stock to any employee who had a child born on the anniversary date. Preliminary estimates were that 15–20 awards would be given. The actual total turned out to be 189.

the IUE for indemnity or contribution and to implead the nonparty unions in order to gain contribution or indemnity for any losses that might be suffered by the company as a result of this action. See the Court's memorandum of April 30, 1973, 59 F.R.D. 267. These issues have been rendered moot, however, by G.E.'s recent agreement at the 1973 contract negotiation talks to indemnify the unions for any losses that might be suffered by virtue of this suit. PX103. Accordingly, G.E. voluntarily withdrew its claims in this regard against the unions. See Notice of Dismissal filed June 18, 1973.[11] Detailed findings with respect to the union's position as represented by the labor steering committee, [see the Court's memorandum of May 16, 1973,] are therefore unnecessary here. For these purposes, however, the Court finds that the unions made initial demands for modification of the S & A pregnancy provisions at the contract talks of 1950, 1955, 1963, 1966 and 1969. See also, Stip. 12. These demands were never acceded to. Further, on February 24, 1972, the Union wrote to G.E. formally requesting a policy change (PX58, 104, 110).

■ Plaintiffs have introduced much evidence in an effort to demonstrate that G.E.'s past history is dominated by a strain of male chauvinism. The Court deems that line of inquiry legally irrelevant and makes no findings with respect to this contention.

The proper starting point is 1964, the year Title VII was enacted. According to Thomas Hilbert, G.E.'s Labor Relations Counsel, G.E. made a unilateral review of its contract practices in 1965 to ensure that they were in compliance with the Civil Rights Act of 1964. Counsel for G.E. questioned at that time whether the S & A policy might be violative of Title VII, but it was tentatively concluded that the S & A maternity policy was not. Mr. Hilbert stated that he

found support for this conclusion in several opinion letters of 1966 issued by EEOC's General Counsel. (DX12) (Discussion in Conclusions of Law, *infra*). An EEOC decision of March, 1971, see paragraph 6221, CCH Employment Practices (discussion *infra*) indicated a possible shift in EEOC policy which was confirmed by the guidelines of April, 1972, *infra*. G.E. itself did not request the opinion of counsel for the EEOC with respect to its S & A policy.

The Court finds that prior to the April, 1972 guidelines, G.E. made no affirmative effort to determine if its policy was in compliance, even assuming arguendo that through March, 1971, it may have had a valid reason for taking the position it did. Subsequent to the April, 1972, guidelines, G.E. made the conscious decision not to comply with the EEOC guidelines and to defend this decision in court. See, *e. g.*, affidavit of Robert Friedman, Assistant General Counsel for the Union, January 2, 1973.

The Court's conclusions of law with respect to these actions are set forth, *infra*.

III. Conclusions of Law

A. Declaratory Judgment: Legality of G.E.'s S & A Policy

On March 3, 1972, the EEOC issued a guideline which provides that:

Disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom are, for all job-related purposes, temporary disabilities and should be treated as such under any health or temporary disability insurance or sick leave plan available in connection with employment. Sec. 1604.10(b). 37 Fed.Reg. 6837 (April 5, 1972).

On May 18, 1973, the EEOC issued a decision in Gilbert v. General Electric,

11. The parties have agreed that the contract provisions on S & A maternity benefits will

be re-negotiated to conform to the outcome of this litigation. PX112.

N.Y.D.C. 3–093 (PX2B), which decision represented the culmination of an investigation commenced upon the filing of their respective EEOC charges by the present named plaintiffs, see memorandum of the Court under date of February 6, 1973. Said decision concluded that the G.E. S & A plan is violative of Title VII.

The law· is well-settled that the decisions or interpretations of agencies entrusted with the enforcement of a federal statute, while not binding on a federal court, are nevertheless entitled to "great deference," Griggs v. Duke Power Co., 420 F.2d 1225, 1234 (4th Cir. 1970), 401 U.S. 424, 433–434 (1971), except under limited circumstances, e. g., where legislative history indicates a contrary result, Griggs, supra, an agency decision may be disregarded. Pursuant to these principles, in the absence of evidence to the contrary as in the instant case, the Court must afford the EEOC decision and guidelines the appropriate weight as mandated by law. Accordingly, the Court is satisfied that the burden is on G.E., as the party challenging the administration's position, to overcome the presumption that its S & A policy is violative of the Act, and this they have failed to do. Indeed the task is an impossible one, for the Court is satisfied that the EEOC's construction, as enunciated in the guideline, is in accord with the will of Congress as expressed in the Act and its legislative history. It is to be kept in mind that the true issue is whether the defendant's policies are violative of Title VII.

G.E.'s contention that because of the voluntary nature of pregnancy they are insulated from the obligation to pay disability benefits to female employees absent from work due to pregnancy-related disabilities loses much viability in light of its policy of providing disability benefits to its male employees for *all* disability, including cosmetic surgery, disabilities arising from attempted suicides, etc.

While pregnancy is unique to women, parenthood is common to both sexes, yet under G.E.'s policy, it is only their female employees who must, if they wish to avoid a total loss of company induced income, forego the right and privilege of this natural state. See Hanson, et al v. Hutt, 83 Wash.2d 195, 517 P.2d 599 (1973). Indeed, under G.E.'s policy the consequence of a female employee exercising her innate right to bear a child may well result in economic disaster, as in the case of at least one of the witnesses who appeared before the Court.[12] No such consequences would befall a male employee who chose to subject himself to a selective operation, such as a vasectomy or cosmetic surgery. Thus, women are required to undergo the economic hardship of the disability which arises from their participation in the procreative experience. The disability is undisputed and inextricably sex-linked. To isolate such a disability for less favorable treatment in a scheme purportedly designed to relieve the economic burden of physical incapacity is discrimination by sex. That such is discriminatory by reason of sex is self evident. G.E.'s contention that the voluntary nature of pregnancy justifies, under Title VII, its treatment of that condition as challenged, must fail. While it is true that women may, under certain conditions, resort to an abortion, see Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), it cannot be reasonably argued that Congress in its enact-

12. This G.E. employee, who became unintentionally pregnant, worked until five weeks before the birth of her child. Being precluded from disability benefits, and without other funds, she resorted to Welfare Aid, but prior to receiving same suffered the cessation of electric and gas service for her home, along with its attendant deprivations including loss of heat and inability to adequately provide for her family.

ment of Title VII ever intended that an intended beneficiary of that Act forego a fundamental right, such as a woman's right to bear children, as a condition precedent to the enjoyment of the benefits of employment free of discrimination.

The question of voluntariness is not really the issue. The fact is that the defendant's policy penalizes plaintiffs and members of their class for being women and suffering disabilities to which they alone are inherently susceptible, and this is discriminatory. See Buckley v. Coyle Public School System, 476 F.2d 92 (10th Cir. 1973).

### B. Cost

■ While as counsel for plaintiff has pointed out, the defendant has not formally pleaded business necessity as a defense to this action, evidence of costs was introduced, and the Court deems it in the interest of a full disclosure of its reasoning leading to the conclusion reached to briefly comment upon that aspect of the case.

Primary, of course, is the principle that business necessity constitutes a valid defense only to a situation where the alleged discrimination arises from a policy neutral on its face, and in its intent. The instant case does not fall in this category. Additionally, it is doubtful in the first instance if cost alone would constitute a proper defense. See Robinson v. Lorillard Corporation, 444 F.2d 791, 799 f.n. 8 (4th Cir. 1971). The business necessity rationale is premised on a policy of justification by virtue of a showing that the suspect conduct is necessary to the safe and efficient operation of the business. Jones v. Lee Way Motor Freight, 431 F.2d 245 (10th Cir. 1970). As one court has expressed it, "Necessity connotes an irresistible demand." United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971). No such situation exists here.

The cost of S & A benefits incurred by the defendant arises by virtue of its contractual obligations, and as expressed by Judge Sobeloff in Robinson v. Lorillard, *supra*, 444 F.2d at 799, "The rights assured by Title VII are not rights which can be bargained away—either by a union, by an employer, or by both acting in concert."

In the instant case, the Company chose to negotiate a contract which they knew would result in certain benefits to their employees and deliberately chose to preclude benefits to employees who became pregnant. They cannot now justify such discrimination by simply contending that the cost would be high. In addition, it is obvious that the cost, if prohibitive or destructive of defendant's business, may be reduced in any number of alternative ways, as suggested in the briefs. Simply stated, there is no evidence before the Court to render viable a defense of business necessity.

The Court's finding of a lack of a viable defense of business necessity is not to say that the Court doesn't recognize that at the core of any suit alleging discriminatory "compensation, terms, conditions or privileges of employment" are dollars and cents. This, obviously, is central to any such action. The relevant argument, however, goes not to increase in company costs, but to non-discrimination in distribution of amounts paid.

The present plan is objectionable in that it excludes from coverage a unique disability which affects only members of the female sex, while no suggestion is made to exclude disabilities which can be said to affect only males. Additionally, the Court gives no weight to the suggestion that the actuarial value of the coverage now provided is equalized as between men and women. Defenses must be bottomed on evidence, and such, in this regard, is lacking here.

Whatever inferences may be suggested by the statistical data presented, the

Court simply cannot presume to draw any precise conclusions as to the actuarial value of the coverage provided under the present plan, or the effect of including pregnancy related disabilities on the basis of that limited data.

While it may, as the Court has already indicated, be theoretically argued that the adding of benefits for disabilities to which only women are subject, and which as a consequence increases their compensation, represents a discriminatory practice against men, such an argument must fail for the lack of evidentiary support. The obvious fact that the risk of pregnancy creates an actuarial risk of disability for women not present for men and which would cost more is simply not enough. Such an argument would require a showing of similar actuarial calculations regarding other disabilities having an exclusive (*e. g.*, vasectomy) or higher (*e. g.* perhaps heart attacks or hair transplants) incidence in men and that discounts for the greater company expenditure to cover such risks had been factored into the calculus prior to the decision to analyze the disparate effects of pregnancy disability benefits. Simply stated it would have to be shown that absent pregnancy disability provisions, the effects of the balance of defendant's disability program were in fact equalized. Merely showing, as G.E. has, that in two previous years the coverage given women's per capita disabilities has cost somewhat more is insufficient especially in light of the myriad of factors which might have and undoubtedly did contribute to such a result. Indeed, the concern of defendants in reference to pregnancy risks, coupled with the apparent lack of concern regarding the balancing of other statistically sex-linked disabilities, buttresses the Court's conclusion that the discriminatory attitude characterized elsewhere in the Court's findings was in fact a motivating factor in its policy. Even had factual evidence been introduced in support of the heretofore discussed theory, a different legal result than the one here reached would not, in the Court's view, have been dictated.

Provision of a marginally greater economic benefit to women, if such it is, in the form of pregnancy disability benefits within an otherwise all inclusive disability program, cannot reasonably be considered more favored treatment. If it be viewed as a greater economic benefit to women, then this is a simple recognition of women's biologically more burdensome place in the scheme of human existence. An industrial policy which does not account for this fails in providing such sexual equality as is within its power to produce. If Title VII intends to sexually equalize employment opportunity, there must be this one exception to the cost differential defense.

Inherent disabilities deriving from pregnancy susceptibility are thus different from other congenital disabilities. Practically speaking, pregnancy is peculiar in that not only is procreation a necessary element of human existence, but it is one which is virtually taken for granted despite the unequal social taxes it imposes. Legally, sexual discrimination is among those expressly limited concerns of Title VII. It is not clear that this single exception to a differential compensation defense is not within the Congressional intent which Title VII embodies.

## C. Good Faith

Section 713(b)(1) provides in part: In any action or proceeding based on any alleged unlawful employment practice, no person shall be subject to any liability or punishment for or on account of (1) the commission by such person of an unlawful employment practice if he *pleads* and *proves* that the *act* or omission complained of *was in good faith, in conformity with, and in reliance* on any written interpreta-

tion or *opinion* of the Commission. 42 U.S.C. § 2000e–12(b). (Emphasis supplied)

■ As the Court has previously noted, G.E. in 1965 made a unilateral review of its contract practices with reference to the Civil Rights Act of 1964.

Defendant argues that its conclusion in 1965 that its pregnancy exclusion policy did not violate Title VII was well founded by virtue of publication in certain of the labor services, namely Commerce Clearing House Employment Practices, of an opinion letter by the EEOC General Counsel issued pursuant to 29 C.F.R. 1601.30, *infra*. This letter, dated October 17, 1966, if directed to G. E. would undoubtedly have given rise to the invoking on its behalf of the good faith defense proclaimed in Section 713(b)(1) heretofore quoted. The weakness of defendant's argument lies in several factors, not the least of which is that the Court is not satisfied that General Electric relied upon the cited letter, or other similar opinion letters referred to in the evidence.

Contemporaneous with the effective date of Title VII, July 1, 1965, the EEOC caused to be published in the Federal Register (30 Fed.Reg. 8407) the following procedural regulation:

> Only (a) a letter entitled "opinion letter" and signed by the General Counsel on behalf of the Commission or (b) matter published and so designated in the Federal Register may be considered a "written interpretation or opinion of the Commission" within the meaning of section 713 of Title VII. 29 C.F.R. Section 1601.30 (1970).

In this Circuit an asserted defense of good faith as contemplated by Section 713(b) of the Act, *supra*, premised upon a specific finding by the EEOC that there was no reasonable cause to believe that the Act had been violated and upon which decision the employer contended it relied in retaining a departmental sen-iority system found by the Court to be discriminatory, was rejected. In commenting on such asserted defense, the Court in referring to the Section 713(b) immunity said:

> ■ Under the Commission's regulations EEOC reasonable cause determinations are not interpretations which may be relied upon to establish the § 713(b) immunity:
>
>> Only (a) a letter entitled "opinion letter" and signed by the General Counsel on behalf of the Commission or (b) matter published and so designated in the Federal Register may be considered a "written interpretation or opinion of the Commission" within the meaning of section 713 of Title VII.

29 C.F.R. § 1601.30. This regulation has been upheld as a reasonable interpretation of the statute in Local 189, United Papermakers & Paperworkers, AFL–CIO, CLC v. United States, *supra* 5 Cir., 416 F.2d 980 at 997. And the Supreme Court has specifically held that EEOC interpretations are entitled to the "great deference" normally accorded interpretations of the agency charged with administering a statute. Griggs v. Duke Power Co., 401 U.S. 424, at 433–435, 91 S.Ct. 849, at 854–856, 28 L.Ed.2d 158.

Moreover, the EEOC interpretation of § 713(b) is an eminently reasonable one. It simply insures that the only Commission interpretations and opinions which will be given binding effect under that section are those based either upon a solid factual foundation or upon the most thorough consideration of the potential factual situations to which the rule might apply. For, as Judge Gewin notes in Beverly v. Lone Star Lead Const. Co., *supra* 5 Cir., 437 F.2d 1136 at 1141,

> [t]he Commission is neither required nor physically able to conduct an "in depth" investigation in every case; apparently the investi-

gative procedure, in the instant case was performed on an ex parte basis, bereft of all of the advantages which come from an adversary proceeding in a court of law. Thus, the regulation gives conclusive effect only to General Counsel opinion letters based on stated factual assumptions, and official interpretive regulations which have received the Commission's most careful consideration.

We hold that a "no reasonable cause" determination is not a "written interpretation or opinion of the Commission" within the meaning of § 713(b).

See, Robinson v. Lorillard Corp., *supra*, 444 F.2d at 801. See also, Local 189, United Papermakers and Paperworkers, *supra*, 416 F.2d 980, 997 (5th Cir. 1969).

Here the evidence, as heretofore noted, discloses no effort by the Company to secure an opinion from the EEOC. Additionally, in May, 1971, the defendant through its counsel, was aware of the fact that prior thereto the EEOC had, in a decision issued March 19, 1971 (EEOC Decision No. 71–1474, CCH–EEOC Sec. P–6221), specifically held that a pre-1969 plan providing for a maximum of thirteen weeks of sickness and accident benefits for temporary disabilities but which excluded those arising out of childbirth or complications of pregnancy violated Title VII. Compounding that knowledge was a specific reference by counsel for the Union to the Manager of Employee Benefits for the defendant, in August of 1971, to the fact that the EEOC had so ruled.

In light of these circumstances, defendant's present contention is self-contradictory. It seems elementary that a defense of good faith presupposes a disposition to exercise it. Notwithstanding the specific knowledge of the EEOC's ruling, and formal requests by the Union for renegotiation of the then existing contract, defendant's position as to

the instant issue remained constant. The Court is satisfied that whatever reasoning guided the defendant's conduct, it was not premised on any EEOC decisions.

### D. Maternity Leave

The maternity leave policy of the Company while presumably national in principle seems not to have been evenly applied as evidenced by the Court's findings, *supra*. In certain instances it appears that the pregnant employee was required to take leave of her position three months prior to birth and not permitted to return until six weeks after the birth. In other instances the periods varied. Regardless of the periods involved, the evidence is clear that under the defendant's bargaining agreement and insurance plan, weekly disability benefits are not payable for absence due to pregnancy or childbirth. In short, of all the employees it is only pregnant women who have been required to cease work regardless of their desire and physical ability to work and only they have been required to remain off their job for an arbitrary period after the birth of their child. In February, 1973, the defendant issued a directive which permits pregnant employees to continue working, if they are able, as long as they wish, subject to medical approval.

### IV. Conclusion

The claim here is not of disparate treatment resulting from sex stereotyping, a claim now familiar in Title VII litigation. See, e. g., Sprogis v. United Air Lines, Inc., 444 F.2d 1194 (7th Cir. 1970). Rather, it is a claim of disparate treatment of persons, otherwise similarly situated, on the basis of a particular condition, the peculiarity of which is both irrelevant to the purpose of the company program and ineluctably sex linked.

There is no rational distinction to be drawn between pregnancy related disabilities and a disability arising from any other cause. The defendant does not

exclude from coverage any disability because it was voluntarily incurred other than disabilities arising from childbirth or other pregnancy-related conditions. That this is sex discrimination is self evident. See Judge Winter's comments in his dissent in Cohen v. Chesterfield County School Board, 474 F.2d 395, 400, 401 (4th Cir. 1973), rev'd. 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1973) (1974). See also, Chief Judge Brown's dissent in Phillips v. Martin-Marietta Corp., 416 F.2d 1257, 1259 (5th Cir. 1969), cited by Judge Winter in Cohen, supra, wherein he, in discussing the unwillingness of an employer who was willing to hire men with pre-school-age children for a certain position but not women in a case premised on Title VII of the Civil Rights Act of 1964, said:

The distinguishing factor seems to be motherhood versus fatherhood. The question then arises: Is this sex-related? To the simple query the answer is just as simple: Nobody—and this includes Judges, Solomonic or life tenured—has yet seen a male mother. A mother, to oversimplify the simplest biology, must then be a woman.

See also, dissenting opinion of Judge Wisdom in Schattman v. Texas Employment Commission, 459 F.2d 32, 42 (5th Cir. 1972), wherein he said, "Female employees are the only employees . . . . . who become pregnant; it follows that they are provisionally dismissed from work on account of their sex . . . ."

The conduct of the defendant in engaging in discriminatory practices against the plaintiffs has been deliberate and intentional, and the plaintiffs are entitled to the relief sought.

An appropriate order shall issue.

## APPENDIX A

### Estimated Annual Births
### Working Population 1972

| Central Age (1) | Birth Rate per 1,000 Population [1] (2) | Total Female Population 1971 [2] (3) | Annual Births (2) x (3) (4) | Married Females Husband Present [2] (5) | Married Female Workers Husband Present [2] (6) | Estimated Annual Births Among Female Workers (4) x (6) ÷ (5) (7) |
|---|---|---|---|---|---|---|
| 17 | 66 | 7,547,000 | 498,102 | 866,000 | 320,000 | 184,056 |
| 22 | 167 | 8,754,000 | 1,461,918 | 4,842,000 | 2,276,000 | 687,180 |
| 27 | 140 | 7,051,000 | 987,140 | 5,466,000 | 2,102,000 | 379,614 |
| 32 | 75 | 5,903,000 | 442,725 | 4,831,000 | 2,004,000 | 183,652 |
| 37 | 36 | 5,825,000 [3] | 209,700 | 4,771,000 [3] | 2,270,000 [3] | 99,773 |
| 42 | 10 | 5,825,000 [3] | 58,250 | 4,771,000 [3] | 2,269,000 [3] | 27,703 |
| 47 | 1 | 6,089,000 [3] | 6,089 | 4,735,000 [3] | 2,317,000 [3] | 2,980 |
| Total | | 74,580,000 | 3,663,924 | 45,443,000 | 18,530,000 | 1,564,988 |

1. Table 56 Statistical Abstract (Table 65, American Almanac).
2. Table B Special Labor Force Report 144, Bureau of Labor Statistics, U.S. Department of Labor.
3. Data available only for two central age groups as follows: Col. (3) 11,650 for 35–44, 12,177 for 45–54 and Col. (5) 9,541 for 35–44 and 9,470 for 45–54, Col. (6) 4,539 for 35–44 and 4,634 for 45–54.

Married Women (Husband Present) in Labor Force March 1972 = 19,249 (Table 7, p. 36, Mo.Labor Rev., April 1973).

Discount for Lower Birth Rate Working Mothers .9.

Estimated Annual Births $1,564,958 \times \dfrac{19,249}{18,530} \times .9 = \underline{1,463,113}$

## APPENDIX B

GE employment statistics with respect to childbirth (excluding data concerning ectopic pregnancies, caesarian births, abortions and miscarriages) disclose that the duration of pregnancy absences prior to the date of delivery for employees at all GE plants and locations is as follows:

| Weeks duration of Pregnancy Absence | 1970 | Cumulative Percent | 1971 | Cumulative Percent |
|---|---|---|---|---|
| Under 1 week | 86 | | 68 | |
| 1 week but less than 2 | 46 | | 52 | |
| 2 weeks but less than 3 | 63 | | 61 | |
| 3 weeks but less than 4 | 76 | | 74 | |
| 4 weeks but less than 5 | 124 | 12% | 106 | 15% |
| 5 weeks but less than 6 | 153 | | 91 | |
| 6 weeks but less than 7 | 195 | | 146 | |
| 7 weeks but less than 8 | 211 | 29 | 167 | 31 |
| 8 weeks but less than 9 | 277 | | 206 | |
| 9 weeks but less than 10 | 246 | 45 | 185 | 47 |
| 10 weeks but less than 11 | 231 | | 162 | |
| 11 weeks but less than 12 | 229 | 59 | 165 | 60 |
| 12 weeks but less than 13 | 275 | | 210 | |
| 13 weeks but less than 14 | 184 | | 153 | |
| 14 weeks but less than 15 | 134 | 78 | 102 | 79 |
| 15 weeks but less than 16 | 117 | | 93 | |
| 16 weeks but less than 17 | 84 | | 58 | |
| 17 weeks but less than 18 | 62 | | 51 | |
| 18 weeks but less than 19 | 52 | | 42 | |
| 19 weeks but less than 20 | 47 | 89 | 36 | 90 |
| 20 weeks but less than 21 | 46 | | 25 | |
| 21 weeks but less than 22 | 42 | | 32 | |
| 22 weeks but less than 23 | 41 | | 23 | |
| 23 weeks but less than 24 | 37 | | 16 | |
| 24 weeks but less than 25 | 14 | | 16 | |
| 25 weeks but less than 26 | 25 | | 20 | |
| 26 weeks but less than 27 | 23 | | 19 | |
| 27 weeks but less than 28 | 27 | | 19 | |
| 28 weeks but less than 29 | 23 | | 15 | |
| 29 weeks but less than 30 | 14 | | 13 | |
| 30 weeks but less than 31 | 16 | | 10 | |
| 31 weeks but less than 32 | 12 | | 17 | |
| 32 weeks but less than 33 | 16 | | 9 | |
| 33 weeks and over | 33 | 100% | 14 | 100% |
| TOTAL | 3,261 | | 2,476 | |

## APPENDIX C

GE employment statistics with respect to ectopic pregnancies and caesarian births disclose that the duration of pregnancy absences prior to the date of delivery for employees at all GE plants and locations is as follows:

| | 1970 | 1971 | | 1970 | 1971 |
|---|---|---|---|---|---|
| Under 1 week | 10 | 5 | 13 weeks but less than 14 | 6 | 4 |
| 1 week but less than 2 | 1 | 3 | 14 weeks but less than 15 | 13 | 10 |
| 2 weeks but less than 3 | 6 | 3 | 15 weeks but less than 16 | 5 | 6 |
| 3 weeks but less than 4 | 3 | — — | 16 weeks but less than 17 | 6 | 3 |
| 4 weeks but less than 5 | 4 | 3 | 17 weeks but less than 18 | 1 | 2 |
| 5 weeks but less than 6 | 7 | 3 | 18 weeks but less than 19 | 1 | 3 |
| 6 weeks but less than 7 | 9 | 9 | 19 weeks but less than 20 | 3 | 2 |
| 7 weeks but less than 8 | 5 | 11 | 20 weeks but less than 21 | 1 | 1 |
| 8 weeks but less than 9 | 16 | 14 | 21 weeks but less than 22 | 1 | 1 |
| 9 weeks but less than 10 | 9 | 10 | 22 weeks but less than 23 | 1 | 1 |
| 10 weeks but less than 11 | 9 | 10 | 23 weeks but less than 24 | 1 | 1 |
| 11 weeks but less than 12 | 6 | 7 | Over 24 weeks | 10 | 8 |
| 12 weeks but less than 13 | 6 | 5 | Total | 140 | 125 |

## APPENDIX D

GE employment statistics with respect to abortions and miscarriages disclose that the duration of pregnancy absences prior to the date of delivery for employees at all GE plants and locations is as follows:

| | 1970 | 1971 | | 1970 | 1971 |
|---|---|---|---|---|---|
| Under 1 week | 83 | 123 | 13 weeks but less than 14 | 1 | 1 |
| 1 week but less than 2 | 16 | 7 | 14 weeks but less than 15 | -- | -- |
| 2 weeks but less than 3 | 8 | 10 | 15 weeks but less than 16 | -- | 2 |
| 3 weeks but less than 4 | 4 | 5 | 16 weeks but less than 17 | -- | 1 |
| 4 weeks but less than 5 | 6 | 5 | 17 weeks but less than 18 | 2 | -- |
| 5 weeks but less than 6 | 5 | 3 | 18 weeks but less than 19 | -- | 1 |
| 6 weeks but less than 7 | 1 | 3 | 19 weeks but less than 20 | 1 | 1 |
| 7 weeks but less than 8 | 5 | 4 | 20 weeks but less than 21 | 1 | -- |
| 8 weeks but less than 9 | 6 | 5 | 21 weeks but less than 22 | -- | -- |
| 9 weeks but less than 10 | 2 | 2 | 22 weeks but less than 23 | 1 | -- |
| 10 weeks but less than 11 | 2 | 2 | 23 weeks but less than 24 | 1 | -- |
| 11 weeks but less than 12 | 1 | 4 | | 147 | 180 |
| 12 weeks but less than 13 | 1 | 1 | | | |

## APPENDIX E

Table 2.—Mothers in the Labor Force, by Marital Status and Age of Children, March 1972–71

(Mothers 16 years of age and over)

| Marital status and age of children | Number | | Percent distribution | | As percent of women in population | |
|---|---|---|---|---|---|---|
| | 1972 | 1971 | 1972 | 1971 | 1972 | 1971 |
| Mothers with children under 18 years | 12,682,000 | 12,201,000 | 100.0 | 100.0 | 42.9 | 42.2 |
| Married, husband present | 10,452,000 | 10,098,000 | 82.4 | 82.7 | 40.5 | 39.7 |
| Other women ever married [1] | 2,230,000 | 2,103,000 | 17.6 | 17.2 | 59.1 | 59.9 |
| Mothers with children 6 to 17 years only | 8,244,000 | 7,874,000 | 65.0 | 64.5 | 52.6 | 52.0 |
| Married, husband present | 6,706,000 | 6,424,000 | 52.9 | 52.7 | 50.2 | 49.4 |
| Other women ever married [1] | 1,538,000 | 1,450,000 | 12.1 | 11.9 | 66.5 | 67.6 |
| Mothers with children under 6 years [1] | 4,438,000 | 4,327,000 | 35.0 | 35.5 | 31.9 | 31.4 |
| Married, husband present | 3,746,000 | 3,674,000 | 29.5 | 30.1 | 30.1 | 29.6 |
| Other women ever married [1] | 692,000 | 653,000 | 5.5 | 5.4 | 47.4 | 47.8 |
| Mothers with children 3 to 5 (none under 3) [2] | 1,950,000 | 2,025,000 | 15.4 | 16.6 | 38.7 | 38.4 |
| Married, husband present | 1,580,000 | 1,680,000 | 12.5 | 13.8 | 36.1 | 36.1 |
| Other women ever married [1] | 370,000 | 345,000 | 2.9 | 2.8 | 55.8 | 56.4 |
| Mothers with children under 3 years [2] | 2,488,000 | 2,302,000 | 19.6 | 18.9 | 28.1 | 27.1 |
| Married, husband present | 2,166,000 | 1,994,000 | 17.1 | 16.3 | 26.9 | 25.7 |
| Other women ever married [1] | 322,000 | 308,000 | 2.5 | 2.5 | 40.4 | 40.8 |

1. Widowed, divorced, or separated.
2. May also have older children.

Source: U.S. Department of Labor, Bureau of Labor Statistics: Summary—Special Labor Force Report, October 1972, Marital and Family Characteristics of Workers, March 1972, and Special Labor Force Report No.

## APPENDIX F

Table 3.—Labor Force Status of Ever Married Women, by Presence
and Age of Children, March 1972

| Race and presence and age of children | Population | Number | Labor force As percent of women in population |
|---|---|---|---|
| Women of all races | | | |
| Total | 61,896,000 | 25,462,000 | 41.1 |
| Mothers with children under 18 years | 29,577,000 | 12,682,000 | 42.9 |
| With children 6 to 17 years only | 15,677,000 | 8,244,000 | 52.6 |
| With children under 6 years [1] | 13,900,000 | 4,438,000 | 31.9 |
| With no children under 3 years [1] | 5,038,000 | 1,950,000 | 38.7 |
| With children under 3 years [1] | 8,862,000 | 2,488,000 | 28.1 |
| Women without children under 18 years | 32,319,000 | 12,780,000 | 39.5 |
| Women of Minority Races | | | |
| Total | 6,590,000 | 3,256,000 | 49.4 |
| Mothers with children under 18 years | 3,439,000 | 1,842,000 | 53.6 |
| With children 6 to 17 years only | 1,754,000 | 1,037,000 | 59.1 |
| With children under 6 years [1] | 1,685,000 | 805,000 | 47.8 |
| Women without children under 18 years | 3,151,000 | 1,414,000 | 44.9 |

1. May also have older children.
Source: U. S. Department of Labor, Bureau of Labor Statistics: Summary—Special Labor Force Report October 1972, Marital and Family Characteristics of Workers, March 1972.

## APPENDIX G

Table 4.—Labor Force Participation Rates and Percent Distribution of Mothers
(Husband Present), by Income of Husband in 1971 and Ages of
Children, March 1972

| Income of husband | Labor force participation rates of mothers with children | | | Percent distribution of mothers in the labor force with children | | |
|---|---|---|---|---|---|---|
| | Under 18 years | 6–17 years only | Under 6 years [1] | Under 18 years | only 6–17 years | Under 6 years [1] |
| Number | – – | – – | – – | 10,452,000 | 6,706,000 | 3,746,000 |
| Percent | 40.5 | 50.2 | 30.1 | 100.0 | 100.0 | 100.0 |
| Under $3,000 | 41.8 | 51.0 | 34.1 | 5.7 | 5.1 | 6.7 |
| $3,000 to $4,999 | 45.1 | 53.0 | 39.0 | 9.9 | 8.0 | 13.4 |
| $5,000 to $6,999 | 46.5 | 57.3 | 37.7 | 15.3 | 13.2 | 18.9 |
| $7,000 to $9,999 | 44.1 | 56.3 | 32.8 | 29.1 | 27.9 | 31.3 |
| $10,000 and over | 35.5 | 45.1 | 22.4 | 40.0 | 45.7 | 29.6 |

1. May also have older children.
Source: U. S. Department of Labor, Bureau of Labor Statistics: Summary—Special Labor Force Report, October 1972, Marital and Family Characteristics of Workers, March 1972.